**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Imad Naim SAADEH, Barbara Sudzus,
and Albert Sudzus, Defendants–
Appellants.**

**Nos. 93–2681, 93–2682 and 93–2705.**

United States Court of Appeals,
Seventh Circuit.

Argued April 14, 1995.

Decided July 20, 1995.

Rehearing and Suggestion for Rehearing
In Banc Denied Sept. 7, 1995.

Mark A. Flessner, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Div., Chicago, IL, Barry Rand Elden, Asst. U.S. Atty. Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, Sean Connelly (argued), U.S. Dept. of Justice, Crim. Div., Appellate Section, Washington, DC, for U.S.

Marc W. Martin, Terence P. Gillespie (argued), Genson, Steinback, Gillespie & Martin, Chicago, IL, for Imad Naim Saadeh.

Richard D. Trainor (argued), Reed, Scoby & Trainor, Ltd., Chicago, IL, for Barbara Sudzus.

Anthony Pinelli (argued), Chicago, IL, Anita Rivkin-Carothers, Chicago, IL, for Albert Sudzus.

Before ALDISERT,[*] BAUER and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Defendants Imad Saadeh, Barbara Sudzus, and Albert Sudzus used a Chicago automobile repair shop as the center for their cocaine distribution business. After a successful drug bust by the Drug Enforcement Administration ("DEA"), a jury convicted all three defendants of violating 21 U.S.C. §§ 841(a)(1) and 846, conspiracy to possess cocaine with the intent to distribute. The defendants now raise a number of challenges to their convictions. For the reasons below, we affirm.

### I.

Albert ("Al, Jr.") and his mother, Barbara Sudzus ("Barbara") ran a Chicago car repair shop called Euro-Tech. Al, Jr. and Barbara contracted out the use of work space in the Euro-Tech building to mechanics who worked as independent contractors. Imad Saadeh, who did not receive a salary from Euro-Tech, used the Euro-Tech facilities to work on his own cars and motorcycles. Like the other workers, he used a large cabinet-sized toolbox to store his tools and other personal items.

In 1987, Al, Jr. and his father purchased 3.4 kilograms of cocaine for $10,000 per kilogram at Euro-Tech from Robert Grinnell. Three years later, Grinnell met Saadeh at Euro-Tech. Saadeh informed Grinnell that "Al" (although Grinnell was unsure whether he was referring to Al, Jr. or his father) had introduced him to the cocaine business by loaning him $100 to make his first drug buy. Over time, Grinnell learned that Dickie Lynn and a man named Bishop assisted Saadeh in the cocaine business and that they used the Euro-Tech garage to count and store their drug proceeds. On two separate occasions in 1991, Grinnell purchased cocaine from Saadeh for personal use.

Following a 1992 arrest for burglary of an automobile, Grinnell agreed to assist the police with a narcotics investigation of the defendants by selling five kilograms for $10,000 each. The "reverse" sting took place over the next two days as follows: Grinnell made six recorded calls from a Schaumberg hotel and restaurant to Al, Jr. at Euro-Tech, claiming that he and a fellow thief, who in reality was undercover Agent Perille disguised as "Mike Mason," had again found cocaine in a car. Al, Jr. initially expressed concern at Mason's presence but later agreed that Dickie would pick up the cocaine.

After two more calls on February 11, Al, Jr. and Grinnell agreed to complete the deal later that day at Euro-Tech. At 12:30 p.m., Barbara left Euro-Tech, climbed into a red Firebird registered to the company and drove slowly twice around the block. She then returned to the garage. Grinnell and Mason arrived at 1:00 p.m. While Mason waited inside the car, Grinnell entered Euro-Tech where Barbara "buzzed" him through the locked front security door. Grinnell told her that he had the five kilograms and Barbara replied, "That's good for you." Several minutes later, when Al, Jr. asked him whether he had brought "the dope," Grinnell responded that he would need at least $15,000 up front. Al, Jr. then made a call and informed Grinnell that Dickie was on his way. Barbara, after announcing that she was "gon-

* The Honorable Ruggero J. Aldisert, of the United States Court of Appeals for the Third Circuit, sitting by designation.

na go check things out," again drove the Firebird several times around the block, carefully looking at Mason's car and a nearby surveillance van. Upon returning, Barbara asked who was in the car and Grinnell told her that it was Mason. Around 1:45 p.m., Saadeh, carrying a brown paper bag, exited a car and entered Euro–Tech with Dickie Lynn. After a brief conversation with Al, Jr. in his office, Saadeh and Dickie went to a toolbox on the work floor. Saadeh, Grinnell and Al, Jr. then went inside Al Jr.'s office where Saadeh pulled three stacks of cash from his pocket, claiming they equalled $15,000, and placed them inside Al, Jr.'s desk drawer. Although Grinnell suggested that he would get the cocaine and they could complete the drug deal then and there, both Al, Jr. and Saadeh objected, insisting that the deal should instead occur at a nearby yard.

DEA Agent William Maloney led a team of officers into Euro–Tech around 2:00 p.m. Upon entering the building, Maloney twice announced he was a federal agent. Barbara, still in the glass-enclosed office that controlled entry into the shop, refused to allow the police to enter and instead yelled: "Cops! The police are here." Maloney saw Saadeh running and instructed the police to break the glass door with their battering ram. Within ten minutes, the police had secured the building and directed everyone (except Barbara) into the garage area, where the police patted them down for safety purposes and ordered them to empty their pockets.

Informing Barbara that there may be drugs, guns or money in the building, Agent Maloney asked if she would consent to a search. Barbara told the agent that she had nothing to hide and signed a written consent form. The officers then searched the premises, finding three packages of currency totalling $15,000 in Al, Jr.'s desk drawer. Officer Michael Egan searched the garage work floor, where he found a toolbox with several locked drawers. Egan asked Saadeh if the toolbox was his and Saadeh responded affirmatively. Using keys that Saadeh had earlier removed from his pockets, Egan opened the toolbox and found bundles of currency totalling $35,000.

All three defendants were charged with conspiracy to possess cocaine with intent to distribute. Before trial, the defendants moved to suppress the currency under the Fourth Amendment. Saadeh also moved to suppress his statement about the toolbox, claiming that it had been elicited in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After an evidentiary hearing, the district court denied both motions. The court found that Barbara had at least apparent authority to consent to the search and that the officers did not exceed her consent in searching the toolbox. With regard to Saadeh's statement, the court held that assuming *arguendo* that Saadeh was in custody, the questioning was not an "interrogation" and therefore not in contravention of the Fifth Amendment.

A jury convicted all three defendants of the charged offense. The court sentenced Al, Jr. to 180 months imprisonment, Barbara to 121 months, and Saadeh to 160 months. This appeal followed.

## II.

The defendants raise a number of issues on appeal. Barbara, Al, Jr. and Saadeh first contend that the district court erred in denying their motion to suppress evidence. Second, Saadeh argues that the district court erred in denying his motion to suppress his statement to the police officers. Third, the defendants maintain that they were denied a fair trial by prosecutorial argument and evidence of other crimes. Fourth, Saadeh contends that he was denied his due process, fair trial and confrontation rights when he was precluded from establishing that the government's primary witness had committed perjury. Fifth, the defendants claim that they were denied a fair trial by the presence of a hearing-impaired juror during the trial and jury deliberations. Finally, Barbara challenges the sufficiency of the evidence supporting her conviction.

### A.

The defendants challenge their convictions arising from the forced entry into the Euro–Tech premises, the warrantless

search of the garage, and the seizure of evidence, as violative of the Fourth Amendment. Specifically, they maintain that the entry was unlawful, that Barbara did not voluntarily consent to the search, and that the scope of Barbara's consent did not include the desk drawer or the toolbox. They assert that the district court therefore should have suppressed the $15,000 recovered from Al, Jr.'s desk drawer and the $35,000 from the toolbox. We review a district court's decision on a motion to suppress for clear error. *United States v. Gilbert*, 45 F.3d 1163, 1165 (7th Cir.1995). Because of the highly fact-specific nature of a motion to suppress evidence, we give particular deference to the district court that had the opportunity to observe witnesses and hear testimony on the issue. *United States v. James*, 40 F.3d 850, 874 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 948, 130 L.Ed.2d 891 (1995). We will only reverse if we are left with the definite and firm conviction that a mistake has been made, *Gilbert*, 45 F.3d at 1165; *United States v. Robinson*, 30 F.3d 774, 781 (7th Cir.1994).

■ The Fourth Amendment protects a person's right to be free from warrantless intrusions into his home, U.S. Const. amend. IV; *United States v. Foxworth*, 8 F.3d 540, 544 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1414, 128 L.Ed.2d 85 (1994), and we have extended this protection beyond residences to cover businesses. *See United States v. Torres*, 751 F.2d 875, 883 (7th Cir. 1984), *cert. denied*, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985). Warrantless entries and searches are presumptively unreasonable absent exigent circumstances and certain other exceptions. *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); *Mason v. Godinez*, 47 F.3d 852, 855 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 125, —— L.Ed.2d —— (1995). Exigent circumstances exist when there is a compelling need for official action and no time to secure a warrant. *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949–50, 56 L.Ed.2d 486 (1978); *Godinez*, 47 F.3d at 856. The government bears the burden of proving that "its agents had an objectively reasonable belief that exigent circumstances existed at the time of their warrant-less entry into the defendant's [premises]." *United States v. Robles*, 37 F.3d 1260, 1263 (7th Cir.1994).

The defendants contend that the police should have obtained a warrant because no exigent circumstances existed that would otherwise justify their entry. We analyze the existence of exigent circumstances from the perspective of the officers at the scene, and ask not what the police *could* have done, but whether they had, at the time, a reasonable belief that there was a compelling need to act and no time to obtain a warrant. *See Foxworth*, 8 F.3d at 544. We repeatedly have held that the potential that evidence, especially drugs, will be destroyed gives rise to exigent circumstances. *Robles*, 37 F.3d at 1263; *United States v. Talkington*, 843 F.2d 1041, 1044 (7th Cir.1988).

■ In the instant case, the DEA's warrantless entry was justified by exigent circumstances. The agents approached Euro–Tech knowing that the defendants used the automobile shop as a center for drug activity. *Cf. Robles*, 37 F.3d at 1263. Grinnell's reports and information, police surveillance, and the recorded telephone conversations reliably led the police to this information. Grinnell also had told the police that he had seen guns at Euro–Tech on prior occasions and that Dickie Lynn always carried a gun. At the time of the entry, the undercover drug deal that was to occur at Euro–Tech had been altered, with the defendants unilaterally changing the location to a different yard owned by Al, Jr. This sudden shift in plans, coupled with Barbara's counter-surveillance, reasonably could have concerned the police and suggested that the defendants might be planning an armed "rip-off" of the cocaine.

Up to the point of entry, the officers had been able to arrange surveillance outside Euro–Tech. However, the officers had no way of knowing what awaited them inside. When they requested entry, Barbara shouted out warnings, raising the possibility that evidence would be destroyed or that the defendants would grab their guns. Behind the doors, the officers could see commotion and people running around. The officers were "facing circumstances that were rapidly pro-

gressing and, for the most part, out of their control," *Foxworth,* 8 F.3d at 544–45, and it was reasonable for them to believe that they needed to act immediately.

Having determined that the DEA officers legally entered Euro–Tech, we must now examine whether their subsequent search was justified by an exception to the warrant requirement. *Robles,* 37 F.3d at 1264 (citing *United States v. Rivera,* 825 F.2d 152, 157 (7th Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987)). As we recently noted in *Robles,* "[t]he exigent circumstances only permitted their entry and securing of the residence, and once this was complete any threat of evidence being destroyed was eliminated. Therefore, we must continue our analysis of the seizure...." 37 F.3d at 1264 (citations omitted).

After the police secured the premises, they returned to Barbara and asked for her consent to their search. Barbara told Agent Maloney that she had nothing to hide and signed a written consent form. The form, entitled "CONSENT TO SEARCH," stated: "1. I have been asked to permit special agents of the drug enforcement administration to search ... 2. I have not been threatened nor forced in any way. 3. I freely consent to this search."

■ The district court concluded that Barbara voluntarily consented to the search and found that "the facts as adduced at the suppression hearing support the conclusion that Barbara Sudzus possessed apparent authority to consent to the search of Euro–Tech." The court also found that the search did not exceed the scope of Barbara's consent. The defendants challenge these findings, arguing that Barbara did not have the authority to consent to a search and that even if she did, her consent was tainted by the prior forcible entry. Because the prior forcible entry did not run afoul of the Fourth Amendment, we turn to the issue of Barbara's authority to consent. The government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. *United States v. White,* 979 F.2d 539, 542 (7th Cir.1992); *United States v. Duran,* 957 F.2d 499, 502 (7th Cir.1992). We review the district court's

determination of Barbara's consent for clear error. *United States v. Kozinski,* 16 F.3d 795, 810 (7th Cir.1994).

■ While a warrantless entry for the purpose of conducting a search ordinarily violates the Fourth Amendment, *see Payton,* 445 U.S. at 585, 100 S.Ct. at 1379, a well settled exception to this general rule permits authorities to conduct a search without a warrant if they obtain voluntary consent either from the individual whose property is to be searched, *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), from a third party possessing common authority or joint control over the premises, *Florida v. Jimeno,* 500 U.S. 248, 249–50, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991); *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), or from an individual with the apparent authority to consent to the search. *Illinois v. Rodriguez,* 497 U.S. 177, 187, 110 S.Ct. 2793, 2800–01, 111 L.Ed.2d 148 (1990).

■ We conclude that the district court did not err in finding that Barbara had the requisite apparent authority to consent to the search. In *Rodriguez,* the Supreme Court held that apparent authority could provide a basis for consent when the police, at the time of the search, reasonably believed that that person had common authority over the premises, even though the person did not in fact possess such authority. 497 U.S. at 188, 110 S.Ct. at 2801. To assess whether apparent authority exists, we look for indicia of actual authority. *See United States v. Rosario,* 962 F.2d 733, 737 (7th Cir.1992) (citing *United States v. Miller,* 800 F.2d 129, 134 (7th Cir. 1986)). As the district court specifically found, and the record more than supports, as the agents entered the premises, they first encountered Barbara behind the window next to the door. She clearly monitored the entry and exit of customers and employees. Furthermore, she informed Agent Maloney that she maintained control over the premises, including access into the building. "The question is not who comes to the door so much as it is whether whoever appears there projects an aura of authority upon which one can reasonably rely." *Rosario,* 962 F.2d at

738. Barbara's physical placement, her statements, her known relationship to Al, Jr., and the officer's knowledge of her control over entry into and exit from the premises made it reasonable for the police to believe she had the authority to consent to the search of the premises. *See United States v. Chaidez,* 919 F.2d 1193, 1201 (7th Cir.1990), *cert. denied,* 501 U.S. 1234, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991).

We also require the government to prove by a preponderance of the evidence that someone who consents to a search does so freely and voluntarily. *See Schneckloth,* 412 U.S. at 222, 93 S.Ct. at 2045; *United States v. Durades,* 929 F.2d 1160, 1163 (7th Cir. 1991). We look to the totality of the circumstances to determine whether consent arose from coercion and duress, or from voluntariness. *Rosario,* 962 F.2d at 738; *United States v. McGuire,* 957 F.2d 310, 314 (7th Cir.1992); *United States v. Quinones–Sandoval,* 943 F.2d 771, 773 (7th Cir.1991). We will not reverse the finding of the district court on voluntariness unless it is clearly erroneous. *Rosario,* 962 F.2d at 738.

■ The defendants argued that Barbara's consent was not voluntary because: (1) the officers informed her that if she did not sign the consent form they would come back with a warrant; (2) the agents did not advise Barbara of her right to refuse to consent; and (3) the agents did not ask Barbara for consent until after they had searched the building and recovered the currency. The totality of circumstances, however, supports the district court's finding that the agents voluntarily obtained Barbara's consent to the search. The agents never threatened Barbara with the availability of a search warrant, *cf. White,* 979 F.2d at 542, and the police were not constitutionally required to advise Barbara that she had the right to refuse a search before procuring her consent, so their failure to do so presents no problem. *United States v. Betts,* 16 F.3d 748, 754 (7th Cir.1994). Furthermore, the consent form that Barbara signed explicitly stated: "I have not been threatened nor forced in any way . . . I freely consent to this search."

■ We are thus left with the issue of the scope of Barbara's consent. The defendants argue that even if Barbara's consent to the general premises was legal, her consent did not extend to the desk and toolbox. We first must determine the scope of Barbara's initial consent. *See United States v. Maldonado,* 38 F.3d 936, 939 (7th Cir.1994). The scope of a search generally is characterized by its expressed object. *Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803–04; *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Maldonado,* 38 F.3d at 939. We apply a standard of "objective reasonableness," asking how a reasonable person would have understood the conversation between the law enforcement officer and the criminal suspect. *Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803–04; *United States v. Torres,* 32 F.3d 225, 231 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 912, 130 L.Ed.2d 794 (1995); *United States v. Dorsey,* 27 F.3d 285, 290 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 949, 130 L.Ed.2d 892 (1995).

■ "A lawful search of fixed premises generally extends to the entire areas in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *Ross,* 456 U.S. at 820–21, 102 S.Ct. at 2170. In the instant case, Barbara had apparent authority over the whole premises, including the toolbox and desk containing the money. *Cf. United States v. Lechuga,* 925 F.2d 1035, 1042 (7th Cir.1991) (general consent to search apartment includes consent to search suitcase located in a closed closet). Agent Maloney expressly informed her that the agents were looking for "money, narcotics and guns." The toolbox and desk drawer clearly were big enough to contain these items and Barbara did not put any express limitation on the scope of her consent.

Finally, we note that Saadeh did not object to the search of his toolbox. In fact, he stood by and watched quietly as the agent opened it. That lack of protest undercuts a defendant's later challenge to a third party's authority to consent. *Cf. Torres,* 32 F.3d at 231 ("Rather than withdrawing or limiting the

broad and all-inclusive consent previously given, [the defendant] stood by silently as [the officer] called for, received, and used a screwdriver to open the wooden box"); *see also United States v. Martel–Martines*, 988 F.2d 855, 858 (8th Cir.1993) (defendant's "failure to object [to search] made it objectively reasonable for the officers to conclude that his general consent to search the truck included consent to access the compartment in a minimally intrusive manner").

Thus, the district court's denial of the defendants' motions to suppress the seized money was not clearly erroneous. The initial warrantless entry was justified by exigent circumstances and Barbara consented to the subsequent search, which consent included not only the general premises, but also the desk and toolbox.

### B.

 Saadeh next argues that the district court erred in denying his motion to suppress his statement to the police that the toolbox was his. At trial, Saadeh objected to the admission of this statement on the grounds that he was in custody when he made these statements but had not been read his *Miranda* rights. The district court rejected this contention, concluding that the questioning did not amount to an interrogation and therefore did not require such warnings. We review the district court's denial of a motion to suppress for clear error. *United States v. Burns*, 37 F.3d 276, 278 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2592, 132 L.Ed.2d 840 (1995); *United States v. McCarthur*, 6 F.3d 1270, 1275 (7th Cir.1993). Because questions arising under the Fourth and Fifth Amendments are primarily factual, "we give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses." *Id.*

 In order to protect a citizen's right against self-incrimination, the Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), that suspects must be read certain warnings before they are subjected to a "custodial interrogation." A suspect must be both "in custody" and subject to "interroga-

tion" in order to trigger the *Miranda* protections. If a suspect is taken into custody or otherwise deprived of freedom of action and is questioned without being informed of these rights, his responses may not be introduced into evidence to establish his guilt. *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S.Ct. 3138, 3144–45, 82 L.Ed.2d 317 (1984); *United States v. Smith*, 3 F.3d 1088, 1096 (7th Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 733, 126 L.Ed.2d 696 (1994).

 The government concedes on appeal that the questioning of Saadeh amounted to an interrogation. Because Saadeh was not advised of his *Miranda* rights prior to his formal arrest, we must determine whether he was in custody for *Miranda* purposes when the officers spoke with him. In making the custody determination, we look to how a reasonable person in the suspect's position would have understood his situation. *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151. This inquiry is based on the totality of the circumstances, *Burns*, 37 F.3d at 280; *United States v. Fazio*, 914 F.2d 950, 954 (7th Cir.1990), including the place and length of the questioning as well as the accused's freedom to leave the scene.

As we recently noted in *Burns*, 37 F.3d at 280, we look to Fourth Amendment jurisprudence, beginning with *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to make this "in custody" determination. *See, e.g., Berkemer*, 468 U.S. at 435, 104 S.Ct. at 3147–48 (analogizing to *Terry* in addressing the issue of whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered custodial interrogation). Relying on *Berkemer*, we have held that *Miranda* warnings are not required where a suspect has been detained pursuant to a *Terry* investigatory stop. *See Burns*, 37 F.3d at 281 (citing *United States v. Boden*, 854 F.2d 983, 995 (7th Cir.1988)). Similarly, because detentions pursuant to the execution of a search warrant are "substantially less intrusive than an arrest," *Michigan v. Summers*, 452 U.S. 692, 702, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981), a suspect who is detained during the execution of a search warrant has not suffered a restraint

on freedom of movement of the degree associated with a formal arrest, and therefore is not "in custody." *Burns,* 37 F.3d at 281 (citing *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)). In *Burns,* we explained:

> Most detentions that occur during the execution of a search warrant, like most *Terry* stops, are "comparatively nonthreatening." They are often short in duration. Moreover, such detentions are "surely less intrusive than the search itself." ... *Therefore, we conclude that, in the usual case, a person detained during the execution of a search warrant is not "in custody" for purposes of Miranda.*

37 F.3d at 281 (emphasis added).

■ Like the defendant in *Burns,* Saadeh was not detained for an unreasonably long period of time prior to his eventual arrest. The officers did not handcuff or physically restrain him in any way until they formally placed him under arrest. The verbal exchange between him and the officer took place shortly after their entry. At the time he was questioned, Saadeh had been treated no differently from other building occupants, all but two of whom were ultimately released and not prosecuted. As Saadeh stipulated, he was not under arrest. Moreover, Saadeh was not the isolated target of any directed questioning; in fact, the officer who asked the question did not even know Saadeh's identity at the time he posed the question. Finally, the officer's questioning was limited in scope and duration—a single question. Although Saadeh contends that he was not free to leave at any time, this subjective belief is not by itself the standard for *Miranda* warnings.

A person detained during the execution of a search warrant is normally not in custody for *Miranda* purposes. In light of the totality of the circumstances, Saadeh's temporary detention did not amount to the functional equivalent of an arrest. The district court did not err in its denial of Saadeh's motion to suppress.

### C.

The defendants also maintain that they were denied a fair trial by improper prosecutorial argument and evidence of other crimes. They first challenge portions of the prosecutor's opening statement and closing argument. They contend that the prosecution's statements misled the jury, created unfair surprise, and violated the district court's pretrial order.

In its pre-trial order, the district court stated that it would not allow the government, in its case-in-chief, to introduce testimony about "events involving transactions between people other than those involved in the indictment." The order allowed, however, "evidence of specific sales at Euro–Tech between January of 1990 and February of 1992, that Grinnell was able to testify from his personal knowledge that occurred at Euro–Tech."

In its opening statement, over objection, the government told the jury that after Grinnell left prison in 1990, he visited Euro–Tech, where he saw Saadeh and two others selling cocaine "on a daily basis." The prosecutor (Flessner) related to the jury that they would hear about the cocaine business run by Saadeh, Dickie Lynn, and Bishop. Flessner informed the jury that the government would present testimony regarding the day-to-day workings of Saadeh's cocaine business, including the use of beepers, money counting at the garage, and the hiding of the money in his toolbox. The prosecution also promised the jury that they would hear evidence regarding Barbara and Al, Jr.'s involvement, including their presence and awareness of the business and their cooperation.

Again, in closing argument, the prosecutor pressed the theme that the defendants were operating an ongoing, daily drug sale enterprise out of the Euro–Tech garage. Commenting on Barbara's counter-surveillance measures, the government argued: "She was troubled by [the presence of the van] because she's a pro. She knows how these things happen. These people have been doing this for years, since 1987 at least. They know what goes on. That was a police van." When defense counsel objected, the court stated: "Ladies and gentlemen, you have heard the evidence. Disregard anything to the contrary."

■ We will not lightly overturn a conviction "on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1984); *see also United States v. Neely*, 980 F.2d 1074, 1083 (7th Cir.1992); *United States v. Ferguson*, 935 F.2d 1518, 1530 (7th Cir. 1991). We will reverse a conviction only if we find that the prosecutor's rhetoric invoked facts not in evidence and deprived the defendant of a fair trial, in violation of his due process rights. *United States v. Waldemer*, 50 F.3d 1379, 1383 (7th Cir.1995), *cert. denied*, —— U.S. ——, 115 S.Ct. 2598, 132 L.Ed.2d 845 (1995); *United States v. Rutledge*, 40 F.3d 879, 888 (7th Cir.1994), *cert. granted*, —— U.S. ——, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995); *United States v. Martinez*, 939 F.2d 412, 415 (7th Cir.1991).

■ This court's review of a claim of prosecutorial misconduct follows a bifurcated analysis. First, this court examines the challenged remark in isolation to determine whether it was improper. If the court concludes that the remark was improper, it evaluates the remark in light of the entire record to determine whether the comment deprived the defendant of a fair trial. *United States v. Spivey*, 859 F.2d 461, 465 (7th Cir.1988). In addressing a claim of prosecutorial misconduct, we recently noted:

> In looking at the entire record, we take into account such considerations as the nature and seriousness of the prosecutor's statements, whether the prosecutor's statements were invited by conduct of defense counsel, whether the court gave a curative instruction, whether defense counsel had an opportunity for rebuttal, and the weight of the evidence against the defendants.

*United States v. Jean*, 25 F.3d 588, 597 (7th Cir.1994); *see also Neely*, 980 F.2d at 1084. Prosecutors cannot infuse their closing arguments with facts that the court has not admitted into evidence, but they may argue reasonable inferences from the evidence that the jury has seen and heard. *Waldemer*, 50 F.3d at 1383.

■ In the instant case, in its opening statement, the government accurately predicted the expected testimony regarding Saadeh's daily drug activities. On direct examination, Grinnell testified that Saadeh sold cocaine out of Euro–Tech, that Grinnell and his two accomplices would receive beeper calls there, would return calls there and then leave, only to return a short time later with cash they placed in Saadeh's toolbox. He testified that he saw Saadeh place money in the toolbox several times each day. Moreover, the district court gave the jury several cautionary instructions prior to the opening statement and closing argument, reminding the jury to consider only the evidence presented and not the attorneys' characterizations. At the outset of the trial, the court cautioned the jury that "during the course of the statements if [attorneys] say something which later the evidence shows is otherwise, you are to follow your own recollection of the evidence and disregard anything that any attorney has said to the contrary." Similarly, the court's final jury charge stressed that "[o]pening statements, closing arguments and other statements of counsel should be disregarded to the extent they are not supported by the evidence." In that we presume a jury to follow the court's instructions, *see United States v. McAllister*, 29 F.3d 1180, 1187 (7th Cir.1994), we have no reason to believe (and the defendants have not offered anything to suggest) that the jury improperly relied on the arguments.

Additionally, the defendants maintain that the government's use of Grinnell's testimony created unfair surprise and violated the court's pre-trial order. In that the government notified the defendants and the court of its intentions to introduce this evidence (which in fact led directly to the pre-trial order), the defendants' surprise argument is wholly without merit. Furthermore, if there were any ambiguity as to the extent of the pre-trial order, the district court was in the best position to interpret its own order, which it did, concluding that this inquiry was permissible.

■ The defendants also assert that the government improperly implied that Barbara had been involved in prior criminal activity

with the remark that: "[S]he's a pro. She knows how these things happen. These people have been doing this for years, since 1987 at least." When defense counsel objected, the district court instructed that the jurors had listened to the evidence and should disregard anything to the contrary. Upon stipulation by both parties, the court also provided a jury instruction that stated:

> The government in its closing argument has inferred that the defendants have been involved in drug activities since 1987. The Court sustains defendants' objections to this argument and orders any such inference in the argument stricken. The defendants are on trial solely for the charges in the indictment. You should consult the other instructions of law as to what effect you should give evidence of wrongdoing not charged in the indictment that you may have heard during the trial. The arguments or statements of an attorney is [sic] not evidence.

Any prejudice that may have resulted from the government's argument was thus cured, for "[a]ny effect adverse to [defendants] from the prosecutor's statements must be presumed to have been negated by the court's curative instruction." *United States v. Easley*, 994 F.2d 1241, 1246 (7th Cir.1993).

The defendants finally argue that Grinnell testified, on redirect examination, that he had stolen cars at the direction of Al, Jr., and that he had brought them to Euro–Tech for "chopping." This testimony came as a result of defense counsel's impeachment of Grinnell for being a car thief and defense counsel's claim that Grinnell operated his own "chop shop." Evidence of other crimes or bad acts cannot be used to prove that a defendant committed the crime charged simply because he has committed a crime in the past. *See* Fed.R.Evid. 404(b). However, when a defendant impeaches a witness with his prior bad acts, he is deemed to have "opened the door," and the witness may testify as to the defendants' involvement in that conduct. *See, e.g., United States v. Prevatte*, 16 F.3d 767, 776–77 n. 8 (7th Cir.1994); *United States v. Touloumis*, 771 F.2d 235, 241 (7th Cir.1985) ("When a party elicits testimony as to only part of a transaction during cross-examination, the opposing party is permitted to elicit testimony as to the whole transaction on redirect examination in order to advise the jury fully of all the facts surrounding the case."). Thus the district court did not abuse its discretion in permitting Grinnell to testify about Al, Jr.'s involvement in the crimes that defense counsel used to impeach Grinnell.

### D.

Saadeh also maintains that the district court denied him his due process, fair trial, and confrontation rights when it precluded him from establishing that the government's primary witness had committed perjury during direct examination where the government failed to rectify the false testimony. Saadeh argues that Grinnell's testimony regarding Saadeh's drug transactions were perjured and that the government knowingly proffered this testimony. Specifically, Saadeh sought to show that Grinnell was incarcerated at the time that he claimed he was with Saadeh at Euro–Tech.

Grinnell testified that he visited Euro–Tech on a "daily basis" starting in 1990 and that he met Saadeh that summer and discussed Saadeh's drug business a month later. He also testified that while at Euro–Tech, he witnessed Saadeh counting significant amounts of cash. Over Saadeh's objections, he testified that Saadeh sold cocaine at Euro–Tech and that Saadeh had explained to him the details of the cocaine business. Grinnell also attested that between mid-summer 1990 and February, 1992 he observed Saadeh place money in a toolbox three or four times a day. After repeating this testimony on cross-examination, defense counsel produced a Cook County jail record showing that Grinnell was imprisoned between August 22, 1990, and June 21, 1991. The court sustained objections to this document. The cross-examination of Grinnell continued and, over the government's repeated objections, defense counsel elicited testimony that Grinnell was in Cook County jail from August 22, 1990 through June 21, 1991 on a parole violation and therefore could not have been at Euro–Tech during that period.

Based on this testimony, Saadeh filed a motion for a mistrial arguing that Grinnell's false testimony was reasonably ascertainable from the records available to the government, including the court file relating to the cases for which Grinnell was incarcerated, his rap sheet, the jail history card, and the bond slip. The court denied this motion and permitted redirect examination of Grinnell. On redirect, Grinnell testified that he did not mean to imply to the jury that while he was in jail he was also visiting Euro–Tech. Saadeh now challenges the district court's rulings on his objections as well as the denial of his mistrial motion.

■ We give considerable deference to the evidentiary rulings of the district court because it has the best opportunity to observe the witness and weigh his credibility. *United States v. Adcox*, 19 F.3d 290, 295 (7th Cir.1994). We will only reverse evidentiary rulings if the court abused its discretion. *Id.* Likewise, we review the denial of a motion for a new trial based on the prosecutor's alleged use of perjured testimony under an abuse of discretion standard and "will not disturb the trial court's ruling on the motion unless there has been an error as a matter of law or a clear and manifest abuse of judicial discretion." *Id.* (internal quotation omitted); *United States v. Douglas*, 874 F.2d 1145, 1159 (7th Cir.), *cert. denied*, 493 U.S. 841, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989).

■ In order to receive a new trial on the basis of the government's use of allegedly perjured testimony, the defendant must establish that: (1) the prosecution's case included perjured testimony; (2) the prosecution knew, or should have known, of the perjury; and (3) there is a likelihood that the false testimony affected the judgment of the jury. *Adcox*, 19 F.3d at 295; *United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir.1990); *Douglas*, 874 F.2d at 1159 (citing *Napue v. Illinois*, 360 U.S. 264, 269–71, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). We have repeatedly held, however, that "[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *Verser*, 916 F.2d at 1271. Rather, "the alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence." *Adcox*, 19 F.3d at 295. Finally, when a defendant alleges that the prosecution used perjured testimony, we must inquire into whether the defendant had adequate opportunity to expose the alleged perjury on cross-examination. *Id.; United States v. Santiago*, 798 F.2d 246, 247 (7th Cir.1986).

■ Saadeh has failed to provide any evidence that Grinnell committed perjury, much less that the government knew or should have known he was perjuring himself. While Grinnell's testimony contained contradictory statements and ambiguities, they do not rise to a level of perjury but are mere inconsistencies. *Cf. Adcox*, 19 F.3d at 296. Even assuming that Grinnell perjured himself and that the government knew of such perjury, Saadeh has not proven that there is a likelihood that the false testimony affected the judgment of the jury. Saadeh has not produced any evidence to suggest that a jury might have convicted him based on Grinnell's testimony about Saadeh's past trafficking rather than because of Saadeh's extensively proven involvement in the charged crime. Saadeh has provided no evidence that the alleged perjured testimony was directly related to the defendant's guilt or innocence in the crime charged. Grinnell's inconsistencies speak only to Grinnell's presence at Euro–Tech and his dating of some of the events. The inconsistencies did not show that Grinnell perjured himself in testifying that Saadeh trafficked drugs at Euro–Tech.

Finally, Saadeh had an ample opportunity, of which he took advantage, to cross-examine Grinnell during the trial, discredit him, and expose any alleged perjury. *Cf. Adcox*, 19 F.3d at 296; *United States v. Langston*, 970 F.2d 692, 700–01 (10th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 439, 121 L.Ed.2d 358 (1992). The trial court's exclusion of Grinnell's jail records did not prevent defense counsel from proving his incarceration and then pointing out the inconsistencies between his presence in jail and his testimony placing him at Euro–Tech. Saadeh's counsel elicited responses from Grinnell highlighting the inconsistencies on several occasions. During his closing argument, defense counsel also made full use of this impeachment, forcefully

noting that Grinnell "out-and-out lied to each one of you," "committed perjury," "committed out-and-out perjury in front of you fine people," and "on top of all his character flaws he out-and-out lied to you people."

Thus, applying the *Adcox* approach, it is clear that the court did not abuse its discretion in denying Saadeh's mistrial motion and ruling on the government's objections.

### E.

■ All three defendants maintain that they were denied their Sixth Amendment right to a fair trial by the presence of a hearing-impaired juror during the trial and jury deliberations. During voir dire, the juror responded fully to all individual questioning about his education, work and family background.[1] During the post-verdict polling, however, that the following exchange took place:

> THE CLERK: The jury will be polled. Ladies and gentlemen of the jury, the clerk will ask you the question, if this was and is this your verdict, will ask you individually by name. And then at the conclusion of asking you individually by name, will ask you in the aggregate if this was and is your verdict.
>
> THE CLERK: Okay. [to juror] ... Was this and is this now your verdict.
>
> (Brief Pause)
>
> THE COURT: Either respond yes or no.
>
> (Brief Pause)
>
> THE MARSHAL: He is hard of hearing, Judge.
>
> THE CLERK: Was this and is this now your verdict?
>
> JUROR: You want me to announce mine?
>
> THE COURT: Was this and is this now your verdict? Yes or no?
>
> JUROR: No.

> THE COURT: Would you step forward, sir?
>
> (The juror had a discussion off the record with another juror.)
>
> JUROR: Yes, it's my verdict.
>
> THE COURT: Wait a minute. Come out of the jury box and stand right there and listen to the question and either reply yes or no.
>
> (The juror complies.)
>
> THE CLERK: Was this and is this now your verdict.
>
> (Brief pause.)
>
> THE CLERK: Was this and is this now your verdict.
>
> JUROR: My verdict is here, not guilty.
>
> THE COURT: Pardon?
>
> JUROR: Guilty. I can't—I don't understand you.
>
> THE COURT: The clerk is asking you, she is polling you, if the verdict forms that were read, is that your verdict, the verdict forms—
>
> JUROR: Yes.
>
> THE COURT: The verdict forms found all three defendants guilty. Was that your verdict?
>
> JUROR: Yes.
>
> THE COURT: All right. You can return to the jury box.

The defendants, relying on *Commonwealth v. Brown*, 231 Pa.Super. 431, 332 A.2d 828 (1974) and *Wisconsin v. Turner*, 186 Wis.2d 277, 521 N.W.2d 148 (1994), assert that the juror not only must have missed portions of the trial testimony, but also could not fully assess the credibility of the witnesses because tonal quality, volume and speech patterns give clues to whether a witness is telling the truth. *See Turner*, 521 N.W.2d at 150. They maintain that because a substantial portion of the government's case relied

---

1. The defendants note that during voir dire examination, the court asked a general question of the venire: "May I assume then that each and every one of you as you sit here now are willing and able to give this case your close attention and to give both sides a fair trial? Does anybody feel that for any reason he or she cannot do that?" There was no response to this question.

The defendants raise the possibility that the juror may not have heard this question. Without any additional evidence, and in light of the form of the court's question, which did not call for a response unless a potential juror felt he or she could not give both sides a fair trial, we will assume that the juror heard the question.

on the credibility of Grinnell, the juror could not render a fair verdict.

*Brown* and *Turner* do not stand for the proposition that the mere presence of some evidence indicating a hearing impairment per se disqualifies a juror and impeaches a verdict. *Brown* requires a showing that "the deafness is of such degree as to indicate that the juror may not have heard material testimony," 332 A.2d at 831, and *Turner* requires a showing that "a juror missed material testimony." 521 N.W.2d at 151. The defendants have established neither. Moreover, although the post-verdict polling process suggests that the juror may have suffered some hearing difficulties in this discourse with the district court, the defendants failed to seek any opportunity to offer proof before the district court that the juror was unable to hear the evidence proffered at trial or during the jury's deliberations. For these reasons, the defendants are not entitled to a new trial.

### F.

Finally, Barbara asserts that the government presented insufficient evidence with which to convict her. We will uphold a jury verdict against a defendant if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781 (1979) (emphasis in original). As we have stated before, this standard places a heavy burden on the defendant challenging the sufficiency of the evidence. *United States v. Theodosopoulos*, 48 F.3d 1438, 1449 (7th Cir.1995).

■ To prove Barbara guilty of a drug conspiracy, the government must have shown beyond a reasonable doubt that: (1) a conspiracy existed; (2) Barbara knew of the conspiratorial agreement; and (3) she intended to join it. *Theodosopoulos*, 48 F.3d at 1449; *James*, 40 F.3d at 864. This burden is met by proving the existence of a conspiracy and a participatory link with the defendant. *United States v. Crowder*, 36 F.3d 691, 695 (7th Cir.1994).

■ To establish that a particular defendant was member of a conspiracy, the government must present "substantial evidence that [the] defendant knew of the illegal objective of the conspiracy and agreed to participate in its achievement." *James*, 40 F.3d at 865 (quoting *United States v. Burrell*, 963 F.2d 976, 987 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992)). Although the jury may not reach its verdict simply by piling inference upon inference, *United States v. Martinez*, 937 F.2d 299, 304 (7th Cir.1991), the government may prove the defendant's participatory link to the conspiracy solely by way of circumstantial evidence. *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir.1991). Thus, while mere presence is not enough by itself to convict a defendant, *see United States v. Cochran*, 955 F.2d 1116, 1123 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 460, 121 L.Ed.2d 368 (1992), this presence, along with other evidence indicating that the presence or act was intended to advance the ends of the conspiracy, suffices. *See United States v. Carson*, 9 F.3d 576, 587 (7th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994); *Cochran*, 955 F.2d at 1123; *United States v. Simone*, 931 F.2d 1186, 1193 (7th Cir.), *cert. denied*, 502 U.S. 981, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991).

■ Barbara contends that the evidence submitted to the jury regarding her involvement in the alleged conspiracy was insufficient because the government failed to prove a participatory link between her and the alleged conspiracy and because no evidence supported the claim that she intended to participate and associate herself with a criminal design and purpose. The record tells a different story. First, her acts of counter-surveillance were sufficient to prove her membership in the conspiracy. *James*, 40 F.3d at 850 ("An overt act of counter-surveillance to ensure that a drug deal takes place ... permits a rational jury to conclude that the parties involved agreed to work together to achieve the conspiracy's criminal aim."); *United States v. Sanchez–Galvez*, 33 F.3d 829, 834 (7th Cir.1994) ("since any overt act in furtherance of a conspiracy may be considered evidence of participation in the conspiracy and since counter-surveillance is an overt

act which furthers the aims of a drug trafficking conspiracy, evidence of counter-surveillance alone should be sufficient to support a conspiracy conviction."). The police testified that Barbara had been seen conducting counter-surveillance of Euro–Tech prior to Grinnell's arrival, and after Grinnell entered, Barbara stated she was "gonna go check things out," at which point she climbed into her car and drove very slowly three times around the block, looking closely at "Mike Mason's" car and the surveillance van. Second, Grinnell testified that after Barbara "buzzed" him through Euro–Tech's locked front door, he told her that he had found five kilograms of cocaine in a car, and she responded "That's good for you." Finally, when the police arrived at the garage's entrance, Barbara denied them entry and called out "Cops! The police are here." These three actions provided sufficient evidence to sustain her convictions.

For the foregoing reasons, the district court's decision is AFFIRMED.