# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 02-3054

ELOY SIMENTAL,

*Petitioner-Appellant,*

v.

RONALD MATRISCIANO,

*Respondent-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 4872—**Robert W. Gettleman**, *Judge.*

_____

ARGUED FEBRUARY 18, 2004—DECIDED APRIL 5, 2004

_____

Before COFFEY, EASTERBROOK, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* This habeas appeal stems from a dispute between two street gangs, the Latin Kings and the Maniac Latin Disciples (MLD), in Aurora, Illinois, over a dozen years ago. After some Latin Kings "disrespected" MLD's leader, the MLD sought revenge, which meant killing Cesar Montalvo, a high-ranking Latin King. On the evening of April 29, 1991, Allen Buckner, MLD's third-in-command, shot and killed Montalvo while he was standing outside a house in Aurora. Eloy Simental, the petitioner in

this case and a member of the MLD, accompanied Buckner and threw a pipe bomb into the house. It broke a window and exploded. After the murder the police focused on the MLD, and the State eventually entered into a cooperation agreement with Daniel Contreras, the MLD's number two ranking official. In return for the dismissal of all charges pending against him, Contreras agreed to testify against Buckner and Simental (who were tried separately). Based largely on Contreras's testimony, a jury found Simental guilty of first-degree murder. He was sentenced to a prison term of 60 years. After an unsuccessful direct appeal and postconviction petition, Simental filed a petition for habeas relief, arguing that he was denied a fair trial when the State suppressed information he could have used to further impeach Contreras, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The district court denied Simental's petition, 2002 WL 1424559 (N.D. Ill. July 1, 2002), and he appeals.

Contreras was the government's star witness. At the time of the murder, according to Contreras, the MLD was a gang of about 50 members that engaged in "organized crime," including the trafficking of drugs, guns, and bombs, as well as "hurting" members of other gangs. Contreras had been a member for about 3 years. Todd Ochsenschlager headed the gang. On the evening Montalvo was killed, members of the gang were partying at Contreras's home, which served as the MLD's headquarters.

That evening, Ochsenschlager briefly left the party. When he returned, he said that he had run into members of the Latin Kings, who had "disrespected" him. He then told his members that "he wanted something done." "Know[ing] what [w]as expected" of them, Buckner and Simental volunteered to avenge the incident. Simental and Buckner then changed into black clothes, including trench coats, hats, and ski masks (they already were wearing black pants). Contreras gave Simental the trench coat and ski mask, but Buckner had his own clothes, "always prepared

if anything happened." (One apparently never knows when a trench coat and ski mask are going to come in handy!) Contreras then gave Buckner a sawed-off shotgun and Simental a pipe bomb.

Contreras asked Patty Velasquez, his sometimes girl-friend, if he could use her car. She agreed but insisted on riding along. At about 8:45 p.m., Contreras, Velasquez, Buckner, and Simental left the party. Contreras drove and Velasquez sat in the passenger seat. The other two sat in the back. They drove to another part of town, where they knew the Latin Kings were hanging out, and about 5 minutes later parked the car. They left the motor running but turned the headlights off. Buckner and Simental then got out of the car and ran down the street. Contreras testified that he remained in the car because he was "already above hurting people," apparently suggesting that as a higher-up in the organization he no longer got his hands dirty. Velasquez asked Contreras what was going on, and he said that Buckner and Simental were collecting money that he was owed. She told him that she had seen Buckner with a gun (even though they tried to conceal it from her so she wouldn't know what was happening) and that she didn't like guns in her car.

Contreras then heard one gunshot, an explosion, and then three more gunshots. Velasquez asked Contreras what the noise was, and he lied and said he didn't know. Buckner, carrying the shotgun, and Simental then came running back to the car, got into the backseat, and Contreras drove off. On the way to Contreras's home, Buckner told Contreras that he thought he killed Montalvo and a second person.

When the group returned to the party, Contreras took the gun and clothes. The party then broke up and Contreras hid the gun. The next day, Buckner went to Contreras's home and showed him newspaper clippings about the shooting and bragged that he was right, that he did kill Montalvo.

Buckner also told Contreras that the police questioned him about the murder but that he was released because of lack of evidence. That same day, Simental also stopped by Contreras's house. According to Contreras, Simental said he was scared that the police would find out what had happened. Simental said he threw the pipe bomb through the window. Contreras told Simental to remain silent.

At trial, Contreras stated that he was testifying pursuant to a deal with the State. In return for his testimony, the government dismissed all pending charges against him. Contreras also had an agreement with federal prosecutors, for which the government dismissed charges against him relating to the illegal possession of explosives. In return, he helped Bureau of Alcohol, Tobacco and Firearms agents recover the weapon that killed Montalvo, as well as several pipe bombs. Contreras also testified that the Aurora police department and the State's Attorney's office paid him $800 cash and helped him relocate to Texas. Contreras admitted, however, that about a month and a half before trial, he stopped contacting Aurora officials in violation of his agreement. As a result, the State revoked the agreement and indicted him for his role in Montalvo's murder. Eventually Contreras was arrested and extradited back to Illinois. A new plea agreement was reached which provided, in addition to the terms of the first agreement, that Contreras would not be charged in connection with the shooting of Montalvo.

Contreras, at trial, was asked if he understood the State's obligations with respect to the deal. He responded, "To dismiss all—all charges that have been brought up on me." Contreras initially indicated that the charges pending included unlawful use of a weapon, aggravated battery, mob action, attempted robbery, criminal damage to property, and the Montalvo murder. After acknowledging that this was a complete list of pending charges, Simental's attorney "reminded" Contreras that he had additional charges of

unlawful use of a weapon by a felon and unlawful posses-
sion of a weapon by a felon pending against him as well.[1]

Contreras also admitted that he initially lied to the police
when questioned about the incident. It was only after he
was arrested on unrelated charges that Contreras, after
speaking with his attorney, contacted the State's Attorney's
office and offered to tell them what happened to Montalvo
(he also self-servingly testified that he wanted to tell "the
people . . . what's going on out in the streets"). Finally,
Contreras admitted his history in the MLD and that he was
involved in all of the gang's activities. He testified that he
had bought the sawed-off shotgun used to kill Montalvo.
Contreras also admitted that he had a previous felony
conviction for possession of marijuana.

After Contreras testified, Velasquez took the stand and
corroborated Contreras's version of the events on the night
of the murder. She also testified that she met Contreras
in 1986 and that they dated on and off since that time. In
1988 she gave birth to a stillborn child fathered by
Contreras. At trial, she was pregnant with Contreras's
child, but she testified that she no longer felt any affection
for him.

Simental testified to a different version of events, stating
that he had nothing at all to do with Montalvo's murder. In
fact, he denied even being a member of the MLD. According
to Simental, on the evening of the murder he had gone to a

---

[1] Prior to trial, the State brought a motion *in limine* seeking
to prohibit Simental from inquiring into investigations pending
against Contreras or into any matter outside the terms of
Contreras's written agreement with the State. The trial court
ruled that Simental could go into the names of the charges that
were part of Contreras's deal but could not go into any details
about those charges. The trial court also ruled that Simental could
not ask about pending investigations not contained in the written
agreement.

local Dairy Queen at about 7:30 p.m. with some friends. At 8:00 he went to the house of another friend and stayed for about 25 minutes. Simental testified that he returned home around 8:45 and talked on the phone with Imelda Ramirez from 9:00 to 9:30. He and his sister then drove a friend of his sister's home at about 10:00. He denied being anywhere near the area where Montalvo was murdered. Several alibi witnesses corroborated Simental's testimony.

Although not implicated as the shooter, the jury found Simental guilty of first-degree murder on an accountability theory. Prior to sentencing, he filed several post-trial motions. Relevant here, he argued that the State failed to disclose an agreement reached with Contreras regarding an incident where he brutally beat a man by the name of Rafael Martinez, leaving him comatose, which had occurred about 2 months prior to Montalvo's murder and was unrelated. The trial court found that there had been a conversation between Contreras and Detective Greg Anderson of the Aurora police department. As a result of the conversation, the court held, Contreras believed that his deal with the State encompassed the Martinez beating. The trial court also found that when the defense was given the details of Contreras's agreement, the fact that there was a deal regarding the Martinez beating was not included. The trial court held, however, that a new trial was not necessary. Specifically, the court concluded that the State demonstrated that the Martinez beating deal was not something the prosecutor could have learned about before trial. Moreover, disclosing this additional matter, in the context of all the other deals which were disclosed, was "merely cumulative" and could not have affected the outcome of the trial.

On direct appeal, Simental argued that his federal constitutional rights under *Brady* were violated. The Illinois Appellate Court affirmed the conviction, however, finding that no *Brady* violation occurred because "the agreement

made with Contreras concerning the additional beating incident was not known to the prosecutor." The court also noted that "one additional agreement would have been of no importance to the ultimate outcome." Simental filed a petition for leave to appeal in the Illinois Supreme Court, which the court denied. Thereafter, Simental filed a post-conviction petition in the state trial court, which was also denied. The appellate court, applying *res judicata*, affirmed. Again, the Illinois Supreme Court denied leave to appeal. This petition for habeas relief followed.

Before proceeding to his *Brady* claim, Simental argues that the district court "deprived [him] of a meaningful review" when it denied his petition without reviewing the state trial transcript, relying instead on the facts as found in the Illinois Appellate Court rulings. We disagree. While the review of a state court transcript is occasionally necessary in habeas cases, it is certainly not required and is, in fact, quite rare. Indeed, as Rule 5 of the rules governing § 2254 cases makes clear, the decision of whether transcripts are necessary is left to the sound discretion of the district court. The rule provides that the answer to a habeas petition must indicate what transcripts are available and what proceedings have been recorded but not transcribed. In addition, the State must attach to its answer any portions of the transcript it deems relevant (here, the State indicated that the trial transcript was available but was not being submitted because it was "unnecessary to a just resolution of this action"). Once this is done, the court, "on its own motion or upon request of the petitioner *may* order that further portions of the existing transcripts be furnished or that certain portions of the non-transcribed proceedings be transcribed and furnished." Rules Governing Section 2254 Cases in the U.S. Dist. Cts., 28 U.S.C. pt. VI, ch. 153, Rule 5 (emphasis added). No request was made here, and considering the loose standard to which we have just referred, the district court certainly did not abuse its

discretion in resolving this case without reviewing the full state transcript. The material facts of this case as they relate to the issue presented were clear, and the district court was able to make an informed decision without plowing through the full state transcript. Finally, we emphasize that on habeas review, except in limited circumstances, the district court does not make independent factual determinations. 28 U.S.C. § 2254(e). *See United States ex rel. Green v. Greer*, 667 F.2d 585, 586 (7th Cir. 1981) (an examination of a record is not required if the petitioner "fails to identify any incompleteness or inaccuracies in the facts before the district court"). On collateral review, factual determinations are the work of the state, not federal, courts.

That leads us to the heart of Simental's claim for relief, that the Illinois Appellate Court's opinion regarding his *Brady* claim was contrary to or involved an unreasonable application of established federal law. That court determined that the prosecution's nondisclosure of an "agreement" regarding Contreras's beating of Martinez was not a *Brady* violation for two reasons. First, the court found that no such "agreement" was known to the prosecution because "although Contreras was left with the impression that he had a deal regarding the beating incident, the detective who spoke with him may not have intended to offer such a deal." Second (and we think more importantly), the court determined that such an agreement was not material. Because the prosecution disclosed a number of other agreements the State had with Contreras, including that it agreed to drop "murder and bombing [charges] involved in the present case," the court concluded, disclosure of the Martinez agreement would have provided little additional impeachment benefit.

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a federal court's power to upset a state court's disposition of a criminal case is limited. A federal court may

grant a habeas petition only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). Applying these standards, the district court denied Simental's petition for habeas relief, a decision we review *de novo.*

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. This rule includes evidence useful to the defense in impeaching government witnesses, even if the evidence itself is not inherently exculpatory. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972). In *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999), the Court outlined three components of a *Brady* claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." The State does not argue that the evidence was favorable to Simental but does dispute that it was suppressed and material. We address each in turn.

Initially, we agree with the district court that the state court correctly stated the law with regard to whether the prosecution suppressed evidence. That court cited our decision in *United States v. Young*, 20 F.3d 758 (7th Cir. 1994), where we held "the prosecution's obligation . . . to disclose information [under *Brady* and *Giglio*] is limited to information known to the prosecution." The appellate court, again quoting our decision in *Young* also noted that the prosecutor's office could not get around *Brady* by "keeping itself in ignorance."

Nor was the Appellate Court of Illinois' application of the facts of this case objectively unreasonable. Here, as the court noted, while Contreras might have been left with the impression that there was an agreement involving Martinez's beating, it was unclear whether the State actually intended to offer such a deal, and there is no evidence to imply that Detective Anderson knew what impression Contreras was left with. Contrary to Simental's argument, there is no evidence that Anderson "clearly indicated" to Contreras that he would receive immunity for beating Martinez; the most that can be said is that he discussed the "possibility" with him. Furthermore, as the appellate court noted, the State "diligently and meticulously" detailed its agreement with Contreras to both defense counsel and before the jury. It was a reasonable inference, as the appellate court concluded, that if the State had knowledge that Contreres believed the Martinez beating was covered, it certainly would have shared that information as well. Considering these facts, we will not disturb the state court's reasonable conclusion that the State did not suppress evidence. *Cf. Banks v. Dretke*, 124 S. Ct. 1256 (2004) (state suppressed evidence in a capital murder case where it did not disclose that one of its witnesses was a paid police informant and another witness's trial testimony was intensively coached by prosecutors and law enforcement).

We next turn to whether the information regarding the Martinez beating was material. Simental argues that had the jury known that Contreras thought his deal with the State encompassed any charges stemming from the Martinez beating, there is a reasonable probability it would not have credited his testimony and come to a different verdict.

The touchstone on materiality is *Kyles v. Whitley*, 514 U.S. 419 (1995). *Kyles* instructed that the materiality standard for *Brady* claims is met when "the favorable evidence could reasonably be taken to put the whole case in

such a different light as to undermine confidence in the verdict." 514 U.S. at 435. Simental, in short, must show a "reasonable probability of a different result." *Kyles*, 514 U.S. at 434 (internal citation omitted).

Here, the Appellate Court of Illinois concluded that the evidence was not material. It wrote:

> [T]he effect of disclosing the additional plea agreement to the jury would have been merely cumulative. Given the number of charges against Contreras which were being dismissed as a result of his plea agreement, in particular the murder and bombing involved in the present case, and Contreras' admitted involvement in a variety of serious criminal activities, we determine that the disclose of this one additional agreement would have been of no importance to the ultimate outcome.

This conclusion is not even close to being objectively unreasonable. At trial, Contreras was heavily impeached. He testified that he was the second-highest member of the MLD and that the gang was involved in trafficking drugs, guns, and bombs and often "hurt[ ]" members of other gangs. He stated, moreover, that his home was used as the gang's headquarters and that he took part in all of the gang's activities. Contreras further admitted that he had a prior conviction for possession of marijuana, that he provided the sawed-off shotgun and pipe bomb used in Montalvo's murder, and that he drove the getaway car for Buckner and Simental. Contreras also testified that he lied to both Velasquez and the police about the murder. With respect to his agreement with the government, Contreras told the jury that he made the deal only after the police arrested him on other charges, gave him $800, and promised to relocate him. He further admitted that he violated the terms of the first deal and had to broker another agreement. Finally, Contreras stated that in return for his testimony, the State agreed to drop any charges against

him based on the Montalvo murder, his unlawful use of a weapon charge, his aggravated battery charge, his mob action charge, his attempted robbery charge, his criminal damage to property charge, his unlawful use of a weapon by a felon charge, and also his unlawful possession of a weapon by a felon charge. While true, as Simental argues, that some of these offenses are not as serious as the Martinez beating, the evidence at trial overwhelmingly established that Contreras was no saint. The jury was fully aware of his role in the gang (including that he was involved in a bombing and murder), his prior criminal history, and the benefits to him testifying. In other words, the jury knew that Contreras had tons of warts; another one or two would have made no difference. Considering all this, it was reasonable for the state appellate court to conclude that the jury's assessment of Contreras's credibility would not have changed if it also knew about the Martinez beating.

Finally, Simental argues that the district court erred in finding that the State did not violate the standards of *Napue v. Illinois*, 360 U.S. 264 (1959), by failing to correct allegedly false testimony made by Contreras. In *Napue*, the Court held that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Id.* at 269 (citations omitted). In order to receive a new trial on the basis of the government's use of allegedly perjured testimony, Simental must establish that: (1) the prosecution's case included perjured testimony; (2) the prosecution knew, or should have known, of the perjury; and (3) there is a likelihood that the false testimony affected the judgment of the jury. *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995) (internal citations omitted). However, "mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *Id.* Rather, "the alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence." *Id.*

Finally, when a defendant alleges that the prosecution used perjured testimony, we must inquire into whether the defendant had adequate opportunity to expose the alleged perjury on cross-examination.

Simental argues that, considering the Martinez beating, as well as an incident occurring shortly after the Montalvo murder in which he struck Karol Wierzbicki in the face and broke his car window, it is clear that Contreras lied when he testified that he was "above" hurting people. However, considering the above standards, we agree with the district court that Simental is not entitled to a new trial. To begin, the Martinez beating occurred 2 months prior to Contreras's testimony. Such timing meant it was theoretically possible that Contreras was telling the truth. Defense counsel, moreover, had ample opportunity to impeach with the fact that he had an aggravated battery charge, which Contreras admitted to the jury. Finally, considering the laundry list of bad acts attributable to Contreras that was before the jury, Simental failed to establish a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976).

Finally, the appellate court's decision that the trial court did not wrongly grant the State's motion *in limine* prohibiting Simental from inquiring into the details of the Martinez beating was reasonable. We agree with the district court that this is simply a recast of his *Brady* claim, and considering Simental's lengthy opportunity to cross-examine Contreras, his Sixth Amendment right to confrontation was not violated. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination . . . .").

The judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*