In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2317

DARRYL TAYBORN,

Petitioner-Appellant,

v.

AUGUSTUS SCOTT, JR., Warden,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 5704--George M. Marovich, Judge.

Argued FEBRUARY 27, 2001--Decided May 29, 2001


   Before COFFEY, RIPPLE, and EVANS, Circuit
Judges.

   COFFEY, Circuit Judge.  In 1992, Darryl
Tayborn was convicted in Illinois state
court of attempted murder, aggravated
discharge of a firearm, and aggravated
battery with a firearm. The state trial
judge sentenced the defendant to
concurrent prison terms of thirty years
for attempted first degree murder, twenty
years for aggravated battery with a
firearm, and fifteen years for aggravated
discharge of a firearm./1 After
exhausting his Illinois state court
remedies, he filed a federal habeas
petition in the Northern District of
Illinois alleging various deficiencies in
his conviction. The district court judge
denied his petition, but granted a
certificate of appealability as to
whether the prosecution knowingly used
perjured testimony during Tayborn's
trial./2 We affirm.

I.  BACKGROUND

   Because Tayborn does not challenge the
facts set forth in the Illinois Appellate
Court decision, we must presume for the
purposes of this appeal that these facts
are correct. 28 U.S.C. sec. 2254(e)(1).
According to the Illinois Appellate
Court's decision affirming Tayborn's
conviction, with modifications, the

following events occurred:

On June 25, 1991, a fan and a radio were taken from [Eric] Murchinson's home. Murchinson learned that Matthew Tayborn, defendant's brother, had taken the items, and on June 26, 1991, at 8 or 9 p.m., Murchinson saw Matthew Tayborn in the alley around the corner from his house. Murchinson exchanged words with Matthew and a scuffle ensued between them. The two men engaged in a fistfight for about five minutes, then Matthew ran away. After the fight, Murchinson went across the street to visit his friend Devon Forest. From Forest's house, Murchinson saw defendant run up the street toward his (Murchinson's) house, and run up to his porch. At that time, defendant was with another young man whose name Murchinson did not know. Defendant picked up the chairs on Murchinson's porch and started to break Murchinson's front windows with the chairs. Murchinson ran across the street to his house and approached defendant. When defendant saw Murchinson, he stated, "is that the one?" then the other man pulled a gun out of his waist and tried to shoot Murchinson, firing the gun five times. Murchinson ran southbound, around the corner, to a friend's house on 114th Street and Forest. Murchinson stated that he did not call the police because he lives in a rough neighborhood and the police would not have helped him. After the incident, Murchinson and his family boarded up the windows and spent the night at his grandmother's house.

Murchinson stayed at his grandmother's house until approximately 5 p.m. the following day, when he met his brother, Johnny Hatfield, and they went to Michelle McGee's house at 114th and State. They stayed at McGee's house until approximately 1 a.m. and then proceeded home. En route, Murchinson observed a group of about ten men standing on the corner of 114th and Calumet, across the street from his house. Murchinson recognized defendant in the group.

Murchinson and Hatfield went into their house and upstairs to their bedroom. Murchinson looked out thewindow for about two minutes and saw four of the men cross the street toward his house. The four men went to the back of Murchinson's house, then came around the side of the house to

the front and approached the front porch. Murchinson saw the men take guns from their waists; three men were carrying "Tech-9" pistols, and the other person had a single-gauge shotgun. Defendant was carrying a Tech-9. Murchinson ran downstairs to warn his family. He peeked through the curtains of the front door and saw the men trying to break the door lock. Murchinson crawled from the front door to the dining room. Suddenly, he heard one of the men tell another to bust down the door, and the men started shooting. They shot through the boarded-up windows, and continued for about 15 seconds, firing approximately 60 shots all together. Hatfield was hit in his side when a bullet came through the living room wall.

The police arrived approximately 20 to 30 minutes after the shooting. Murchinson told the police that defendant was one of the shooters, and gave the police a description. About an hour later, Murchinson identified defendant in police custody.

Johnny Hatfield testified that on June 26, 1991, he came home at 8 or 9 p.m. to find the front windows of his house broken. The police arrived, and Hatfield talked to them. Subsequently, Hatfield and his mother boarded up the windows. Hatfield found two .38 caliber shell casings outside around the front porch area at the bottom of the stairs. He picked them up, brought them inside, and placed them on the dining room table.

Hatfield returned to his house the next morning at 9 a.m. and noticed that the board on the front window had been kicked in. When he entered the house, he noticed that the color television set was missing. He replaced the window board and his mother called the police. He stayed at the house until approximately noon, and then returned to his grandmother's house.

Hatfield testified corroborating Murchinson's testimony as to the events on the evening of June 26 and the shooting in the early morning hours of June 27, 1991. Hatfield was taken to the hospital after the shooting and treated for a gunshot wound. The bullet removed from his side was a .9 millimeter.

Officer John R. Butler, a Chicago Police Department evidence technician, testified that on June 28, 1991, at 1:50 p.m. he investigated the crime scene at 11426 South Calumet. Officer Butler found the front door and windows broken and boarded up, and noticed bullet holes in the boards. He recovered a fired bullet and eight .9 millimeter cartridge cases from the front porch. Officer Butler also recovered two .32 caliber automatic bullets that had not been fired.

Officer Butler found that some of the boarding from the front windows had been knocked into the living room. He noticed firearms damage to furniture and approximately six bullet holes in the walls. He recovered additional fired bullets from the shelf of a table next to the couch, and inside the coffee table. In the dining room, he observed damage to furniture and bullet holes in the walls, and firearms cartridges on the floor. He recovered two spent cartridges and two .38 special "plus P" caliber rounds from underneath the dining room table.

Chicago Police Officer David Edison testified that on June 28, 1991, at 1:16 a.m. he and his partner Alma Runsford investigated the shooting at 11426 South Calumet. When he arrived at the scene, he noticed a crowd of at least ten people in front of the house. Officer Edison walked up to the front porch and saw numerous expended .9 millimeter shells. As he entered the house, he saw the same type of shell on the floor in the front room, bullet holes in the walls, and spent bullets on the floor. He found Johnny Hatfield sitting on the dining room floor and saw that he had a bullet wound. Officer Edison called for an ambulance and the mobile crime lab.

Officer Edison then questioned Murchinson. Murchinson told Officer Edison that he and Hatfield were walking home at 1 a.m., and as they approached their residence, they noticed a large crowd of black males across the street. Murchinson and Hatfield entered the house. Murchinson said he was suspicious of the group, so he went upstairs and looked out of the second floor window. At that point, Murchinson saw 4 men crossing the street towards his porch. Murchinson then saw three of the men pull out "Tech-9s," .9 millimeter semi-automatic

pistols, and the fourth man pull out a shotgun. Murchinson identified defendant as one of the men who pulled out a gun as he crossed the street toward Murchinson's house. Murchinson also told Officer Edison about the conflict that had arisen between him and Matthew Tayborn.

Officer Terrence Gibbons testified that on June 28, 1991, at approximately 1:15 a.m. he and his partner Officer Fred Benson responded to a call regarding gunshots fired at 11426 South Calumet. When they arrived, Officer Edison was already there, and a crowd of people had gathered on the sidewalk. Officers Gibbons and Benson found shell casings and bullet holes on the front porch. They entered the house and found Hatfield lying on the dining room floor, and also observed bullet holes in the interior walls of the house and in some of the furniture. Gibbons interviewed Murchinson and his mother at the scene and learned that the offenders ran three or four doors north to hide in an abandoned building, and that they were armed with Tech-9 pistols, a type of machine gun. The officers went to the abandoned house and searched the grounds.
After about twenty minutes, the officers returned to 11426 Calumet. The officers spoke to Murchinson and his mother again and learned defendant's name, address and physical description. The officers then went to 11421 Forest and found defendant. The officers searched defendant and took him back to the scene. At the scene, defendant was identified as the offender in the shooting.

Andrea Harris, Murchinson's and Hatfield's mother, testified on behalf of the State that on June 26, 1991, she came home at approximately 8 p.m. and found all of the front windows of her house broken. She boarded up the windows, and then went to stay at her mother's house. She returned to her house the next morning at 9 a.m. and found her television missing. The windows that she had boarded were kicked down, and the front door was open. Her stereo had been taken apart and it was standing by the front door. She and Hatfield re-boarded the windows and she called the police.

At 12:45 a.m. on June 27, Harris heard Murchinson and Hatfield come in the front door. She went to the kitchen to meet

Hatfield, and Murchinson went upstairs. She then looked out of the front door and saw a man ride by on a bicycle. She also noticed a group of men standing across the street. She yelled upstairs to Murchinson, asking him if something was wrong and he said no. Harris then saw the same person ride past the house on a bicycle again, and this time another person was with him, an individual she recognized as Derrick. The bicycle rider dismounted the bicycle and gave the bicycle to Derrick. They then stood for a few seconds in front of the house, at the bottom of the porch steps. Harris began to walk back toward the kitchen, when Murchinson yelled "get down, get down, they have Tech-9s." Harris then saw shadows on the porch, the board was kicked in and she heard gunfire. She could see the flashes of the guns in the mirror on the wall, and could hear the bullets hitting different things. Hatfield yelled that he was hit, Harris turned on the light and saw that there was blood everywhere and Murchinson was holding Hatfield. The neighbors came over, and then the police arrived. Harris spoke with police officers, then rode in an ambulance to the hospital with her son.

Tayborn, 627 N.E.2d at 10-13.

The defense presented one witness.

Ravin Houskins, a Cook County Department of Corrections social worker testified on behalf of the defense that she lives at 11440 South Forest, and that Calumet Street is east of her house. On June 28, 1991, at approximately 1 a.m., Houskins was sitting on her front porch waiting for her daughter to get home. She saw defendant and Derrick pushing bikes in the middle of the street. After they walked by she heard gunshots coming from a northeasterly direction. When she looked over, she saw defendant and Derrick still standing in the street. On cross-examination, Harris admitted that she was not sure of the exact time she saw defendant and Derrick in the street. Harris stated that she sat on her porch until 1:25 when she went to pick up her daughter. After Harris' testimony, the defense rested.

Id. at 13.

As mentioned previously, a jury convicted the defendant of attempted first degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm. The trial court sentenced the defendant to three concurrent prison terms of thirty years for attempted first degree murder, twenty years for aggravated battery with a firearm, and fifteen years for aggravated discharge of a firearm./3

With regard to the one issue on appeal, whether the prosecution knowingly used perjured testimony, Tayborn argued that two individuals, Murchinson and Hatfield, committed perjury when identifying him as the assailant. With respect to Murchinson, Tayborn claimed that he (Murchinson) "gave three different accounts" of what happened on the night in question--1) in an interview with the police; 2) at the preliminary hearing; and 3) at trial. Specifically, Tayborn asserted that Murchinson's version of events contained the following discrepancies: 1) whether he heard a noise before looking down from the porch to identify the attackers; 2) whether he gave the police the names of Tayborn and his brothers; 3) the number of shots fired; and 4) whether, in fact, he gave the police a physical description of the other men involved. Tayborn further asserted that Murchinson lied concerning the type of guns he saw and also fabricated the fact that he could see the attackers from the front porch.

With respect to Tayborn's claim that the government knowingly used perjured testimony from Murchinson, the district judge concluded that the statements that Tayborn pointed to were inconsistences rather than fabrications and therefore fell short of perjurious testimony. Additionally, the court concluded that even if it were to assume that the statements did amount to perjury, Tayborn failed to offer any evidence that the government knowingly used such false testimony. In fact, all Tayborn had to say in this regard was

that the prosecution must have known that [Murchinson's] testimony, which it elicited, was false. He further argues that only through gross negligence could the prosecutor have failed to conclude that the testimony was perjured. If in

fact the prosecutor did fail to draw that conclusion, petitioner argues that the state should nevertheless be charged with it.

Not surprisingly, Tayborn offered no legal authority for his theory.

With respect to Hatfield, Tayborn submitted an affidavit by him (Hatfield) in support of his claim that the prosecution knowingly used perjured testimony. Although Hatfield testified at Tayborn's trial that he saw Darryl Tayborn standing in a group of men on the night in question, his affidavit states that "I did not see Darryl Tayborn, instead I was told by the Assistant State's Attorney and my brother [Murchinson] that it was Darryl Tayborn, who had shot me, and that is what caused me to testify falsely."

The district court determined that even if Hatfield's testimony was false, "there is no likelihood that this purported false testimony affected the judgment of the jury." This was so because, according to the district judge, "Hatfield's testimony that he saw Tayborn in a group of men in front of his house on the night in question was merely cumulative and essentially tangential." The judge then went on to deny Tayborn's petition, but granted the petitioner a certificate of appealability as to whether the government knowingly used perjured testimony.

II.  ANALYSIS/4

It is well-established that the introduction of perjured testimony, without more, does not rise to the level of a constitutional violation warranting federal habeas relief. Shore v. Warden, 942 F.2d 1117, 1122 (7th Cir. 1991). Rather, when a defendant seeks a new trial on the ground that the government used perjured testimony, he "must establish (1) that the prosecution indeed presented perjured testimony, (2) that the prosecution knew or should have known of the perjury, and (3) that there is some likelihood that the false testimony impacted the jury's verdict." United States v. Thompson, 117 F.3d 1033, 1035 (7th Cir. 1997).

With respect to Murchinson, Tayborn argues that several inconsistencies in

his testimony rendered his testimony perjurious and that the prosecution should have known it was perjurious. However, Tayborn only points to collateral inconsistencies in Murchinson's testimony like: 1) whether he heard a noise before looking down from the porch to see the attackers; 2) whether he gave the police the names of Tayborn and his brothers; 3) the number of shots fired; and 4) whether he gave a physical description of the other men involved.

None of these supposed inconsistencies go to the heart of Murchinson's testimony--that Tayborn committed the crimes charged. We have emphasized, and the district judge recognized, that mere inconsistencies in the testimony of a government witness fall short of establishing that the government knowingly used false testimony and that "the alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence." United States v. Magana, 118 F.3d 1173, 1191 (7th Cir. 1997). Because none of Tayborn's alleged inconsistencies with respect to Murchinson relate directly to the question of the petitioner's guilt or innocence, his habeas petition cannot succeed on this ground.

The petitioner also relies on the recantation provided in Hatfield's affidavit to support his claim that the government knowingly used perjured testimony. As mentioned previously, Hatfield testified at trial that he saw Tayborn in the group of men near his house on the night in question. In his affidavit, however, Hatfield states that he did not personally see Tayborn on the night in question and that he identified Tayborn only because his brother and an unnamed Assistant State's Attorney told him that Tayborn was the man who shot him.

Even assuming Hatfield's testimony was false at the trial, the falsehood is deemed to be material only "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976); see also Giglio v. United States, 405 U.S. 150, 154 (1972); Napue v. Illinois, 360 U.S. 264, 271 (1959). As the Supreme Court has

held, this standard of materiality is equivalent to the Chapman v. California, 386 U.S. 18, 24 (1967), "harmless beyond a reasonable doubt" standard. United States v. Bagley, 473 U.S. 667, 679 n.9 (1985).

As recognized by the district court, Hatfield's testimony was merely cumulative to that of the state's chief witness, Murchinson. It was Murchinson who provided the jury with testimony concerning Tayborn's motive as well as identified Tayborn as the assailant. Additionally, there was physical evidence supporting Murchinson's testimony.

For example, Murchinson testified that he saw Tayborn with a Tech-9 pistol, a 9 millimeter handgun. Importantly, the bullet removed from Hatfield was a 9 millimeter and 9 millimeter cartridge cases were removed from the front porch after the shooting. Further, Officer John R. Butler, an evidence technician, verified the testimony regarding the damage to the boarded up windows, which was part of the dispute that led up to the shooting.

Thus, we are of the opinion that Tayborn has failed to establish that there is any reasonable likelihood that the jury would have reached any different conclusion without the allegedly false testimony provided by Hatfield. For in the end, Hatfield's recantation does not say that Tayborn did not shoot him, all it says is that he did not see Tayborn on the night he was shot.

The decision of the district court is

AFFIRMED.


FOOTNOTES

/1 Tayborn's aggravated battery conviction was overturned by the Illinois Appellate Court, see Illinois v. Tayborn, 627 N.E.2d 8 (1st Dist. 1993), but his other two convictions were affirmed.

/2 Tayborn's motion to expand the certificate of appealability is denied.

/3 As mentioned before, the Illinois Appellate Court overturned Tayborn's aggravated battery conviction.

/4 Although the government concedes that, with respect to the issue of whether the government knowingly used perjured testimony, there is no state court decision to which we must defer to under 28 U.S.C. sec. 2254(d)(1), we still defer to the state's determination of the facts surrounding Tayborn's actions on the night in question. 28 U.S.C. sec. 2254(e)(1).