In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 09-1647 & 09-3454

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HURREON SEAN WALKER and
RASHAD LOGAN,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 CR 0270—**Charles R. Norgle, Sr.**, *Judge*.

ARGUED FEBRUARY 25, 2011—DECIDED MARCH 9, 2012

Before EASTERBROOK, *Chief Judge*, and FLAUM and
ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Hurreon Walker and Rashad
Logan were convicted of drug and gun charges after
separate jury trials. Both defendants were sentenced to
25 years' imprisonment. They had plotted with two
other men to rob a cocaine stash house at gunpoint, but
the stash house did not actually exist, and their partners

turned out to be an undercover agent and a paid informant. That informant, Jamie Ringswald, had targeted the defendants and generated the bulk of the evidence against them. He also played a significant role at their trials. Yet Ringswald was not called by prosecutors to *testify*, and instead the government introduced his story entirely through audio recordings and narrative from investigators. Prosecutors justified this approach with the explanation that none of Ringswald's out-of-court statements was being offered for its truth. What's more, the government persuaded the district court to prospectively curtail impeachment of Ringswald.

On appeal Walker and Logan contend that their Sixth Amendment right to confront Ringswald was violated by the government's unfettered use of his out-of-court statements and the district court's restriction on impeachment. Logan also contends that his convictions are not supported by sufficient evidence and that his overall prison sentence is unreasonably long. Logan's separate arguments lack merit, but we agree with the defendants that the handling of Ringswald's statements, some of them obvious hearsay, raises a concern about the Confrontation Clause. We conclude, however, that any error was harmless, and thus we affirm the judgment as to each defendant.

I.

Ringswald had accumulated at least five felony convictions before he targeted Walker and Logan while working as an informant for the Bureau of Alcohol, To-

bacco, Firearms and Explosives ("ATF"). Initially the ATF had been investigating Walker's brother, but he spurned Ringswald's proposal to rob a stash house. He volunteered, however, that Walker and Logan might be willing. Agents then sent Ringswald after Walker, who recruited Logan. Using details scripted by the ATF, Ringswald explained that a disgruntled courier for a Mexican cartel, later played by ATF Special Agent Christopher Bayless, wanted help in stealing the cocaine from one of the cartel's stash houses. At a party on April 24, 2007, Ringswald introduced Bayless to Walker and Logan in the first of three meetings conducted under ATF surveillance. Bayless would become the government's principal witness against the defendants and provide the foundation for voice recordings made by Ringswald. Bayless also would recount statements made by Ringswald to another ATF agent.

The April 24 party was captured on audio and video. Agent Bayless asked the defendants if Ringswald had shared the "skinny" on the planned heist. Walker said yes but wanted Bayless to repeat the "lowdown." The agent then outlined his plot to rob a stash house in retaliation for being forced to help pay for cartel drugs that had been stolen from a courier he recruited. Bayless explained that the cartel's couriers were given a 45-minute window to arrive at a stash house and pick up loads of cocaine typically weighing between 15 and 20 kilograms. Each stash house, he said, was situated in one of two contiguous Chicago suburbs, but was never the same location used twice. Couriers were not told the address in advance, although the choice of suburb was

disclosed one day before a delivery. Two armed guards, Bayless cautioned, would be posted at the stash house. Walker absorbed this information and commented that they didn't "need either one o' their asses" and "might have to pop these mo'-fuckas." He proposed that they rush in "and pop the one" at the door.

From there the conversation turned to the mechanics of the robbery. Bayless told Walker and Logan that the next distribution was planned for sometime after 3:00 p.m. on May 1, seven days later. Bayless proposed that on that day and hour the four of them rendezvous at a forest preserve (where, he mused, the probability of encountering surveillance cameras would be low) to await news of the stash-house address. They decided that Bayless would enter the stash house first, followed by the others. The conversation ended in agreement to reconvene for another strategy session on April 30 after Bayless had learned in which of the two suburbs the stash house was located.

Throughout this conversation, Walker did most of the talking for the defendants. Logan chimed in, however, when the discussion turned to shooting the stash-house guards: "It comes to it, we ain't, we ain't duckin' it, though. You feel me"? When Agent Bayless replied, "Ya gotta do what you gotta do," Logan agreed, "Hell, yeah. No prob'm." Logan also proposed finding a hotel in a neighboring town where they could lie low after the robbery.

Two days later, on April 26, Ringswald appeared at the ATF office and told Special Agent Matthew Inlow, who was working with Agent Bayless, that Walker had just

given him a Smith & Wesson .357 Magnum revolver. Or more precisely, that was the hearsay account of Walker's deed elicited through Agent Bayless; prosecutors did not call Ringswald at either trial, nor at Logan's trial did they call Agent Inlow. According to Bayless, the gun had been inside a purse in Ringswald's car when the informant arrived at the ATF office.

The April 30 meeting went forward as planned, except that Logan did not attend. As before, the ATF obtained video and audio recordings. Walker strategized with Ringswald and Agent Bayless about whose car to use, who should drive, and where in the car the defendants and Ringswald should hide during the trip to the stash house. Bayless confirmed the May 1 delivery and reminded the group that the guards at the stash house would be armed. He also got Walker to admit giving the Smith & Wesson revolver to Ringswald. That "fuckin' 3-5-7 you dropped Jamie," the agent told Walker, "is huge, man!" Walker chuckled and said he also had access to "a few automatics." But usually, he told Bayless, when adversaries "see some'in' like that" revolver, they "know when to quit."

The next day Ringswald was outfitted with a tape recorder and video camera before he met Walker and Logan for the trip to the forest preserve. On the ride over in Walker's vehicle, Logan groused that, despite expecting "to get a lot o' keys" of cocaine, he really "would like to have some cash" from the robbery. And whether two guards or five, he said, "I'll go in there" for the money. As evidenced by the audio recording, Walker

obtained Ringswald's assurance that Bayless would be carrying the Smith & Wesson revolver. Even so, the three men agreed, there was risk in committing the robbery armed only with a single gun (a "Mission Impossible-ass" task, in Logan's opinion), so the group detoured to a residence for another weapon. Walker went into the house alone, and while waiting Logan ventured that he knew where to get another gun if Walker failed. But Walker returned with a "heater," which, he boasted, would "even up the odds." He added that he "could o' got pistols" from a "lot o' motha-fuckas."

When the group joined Agent Bayless at the forest preserve, Ringswald told him, "I got one more pistol on me." After the four men had reviewed the robbery plan again, Bayless gave the arrest signal. Walker and Logan ran but were captured quickly by the SWAT team hiding in the woods. Ringswald gave the agents a Sturm Ruger revolver. The gun had not been in his possession when ATF agents searched him before he joined Walker and Logan in the vehicle.

The defendants were taken to a police station and interrogated. Walker's statements were not offered at his trial. Logan's confession was admitted. Logan had said after *Miranda* warnings that Walker recruited him to help with the robbery, that he accompanied Walker and Ringswald to retrieve the first gun from the home of Walker's girlfriend, and that they obtained the second gun from her house on their way to the forest preserve.

A grand jury indicted Walker and Logan together, but the cases were severed for trial because of Logan's con-

fession. Both men were charged with conspiring to possess cocaine with intent to distribute, 21 U.S.C. §§ 846, 841(a)(1); attempting on May 1 to possess cocaine with intent to distribute, *id*.; and possessing and carrying the Sturm Ruger revolver in connection with the drug offenses, 18 U.S.C. § 924(c)(1). Walker also was charged with two additional counts of possessing a firearm after a felony conviction, *id*. § 922(g)(1).

Walker was tried first. Before then the government filed a motion *in limine* seeking to introduce, at both trials, audio and video recordings of conversations between Ringswald and the defendants. Prosecutors said that Ringswald would not be a government witness but argued that his absence would not violate the defendants' rights under the Confrontation Clause of the Sixth Amendment so long as "the government specifies (and the jury is instructed)" that his out-of-court statements "are offered not for their truth, but rather are offered to provide context so as to make the defendant's statements intelligible as admissions." At the same time the government proposed restricting the defendants' ability to impeach Ringswald. According to prosecutors, the admission of recorded conversations involving the nontestifying Ringswald would "not confer any right to cross-examine or impeach" him under the Confrontation Clause or Rules 607 and 806 of the Federal Rules of Evidence. The government insisted that the defendants could impeach Ringswald only if they called him themselves, and then only if his trial testimony contradicted earlier statements. Moreover, prosecutors maintained, the defendants should not be permitted to call Ringswald

without making "a pretrial showing of the relevance of any expected testimony."

Walker reacted by asking the district court to compel prosecutors to "produce" Ringswald at trial. Walker emphasized Ringswald's significant role in the government's sting, and suggested that admission of his recorded statements would, in his absence, violate the Confrontation Clause as interpreted in *Crawford v. Washington*, 541 U.S. 36 (2004). Walker also noted that weighing Ringswald's credibility would be an important consideration.

The district court issued a written order granting the government's motion *in limine* without directly commenting on Walker's response:

> Statements of the CI will be admitted not for their truth but to establish context to the otherwise admissible statements of the co-conspirators or statements admissible as admissions. Thus, the CI may not be called by the defense for the purpose of challenging the truth of any statements at issue or for the sole purpose of impeachment. Whether the CI may be called by the defense for some other purpose is not decided by this order. Counsel may be heard on this issue outside the presence of the jury before the CI is called.

The district court repeated this ruling immediately prior to the start of Walker's trial. Before jury selection, prosecutors announced they would not be calling Ringswald but had served him with a trial subpoena and would make him available to Walker as a defense witness. That

representation prompted the court to tell Walker he could not call Ringswald "simply to impeach him, to dirty him up, so to speak, or otherwise attack him without any substantial reason for doing so." The fact that the government had made him available, the court explained, did not mean that Ringswald could be called for an "illegitimate purpose." Walker did not call Ringswald to testify nor did he further object when prosecutors introduced evidence of the informant's out-of-court statements.

At both trials Agent Bayless provided the foundation for the recordings and explained the conversations secretly taped on April 24, April 30, and May 1, 2007. Those recordings included Ringswald's discussions with Walker and Logan concerning the planning of the robbery. Included, too, was Ringswald's statement to Bayless on May 1 that he had acquired another gun. Prosecutors also elicited through Bayless that Ringswald had delivered the Smith & Wesson revolver to Agent Inlow, saying he received it from Walker. Ringswald was not a government witness at either trial, and Inlow did not testify at Logan's trial.

Although Walker stood on his written response to the government's pretrial motion *in limine*, Logan objected before Agent Bayless recounted that Walker had given the Smith & Wesson revolver to Ringswald, who then gave it to Agent Inlow. Logan disputed the district court's assertion that this testimony was not being offered to prove the matter asserted; Bayless's testimony, Logan ventured, was all that tied the defendants to this par-

ticular gun. Logan added that this hearsay was prob-
lematic because the government would not be calling
Ringswald to testify. The district court reasoned that
the hearsay concern was resolved by the government's
representation that Inlow would testify (although he
never did), and Logan was unable to change the court's
mind by explaining that Bayless was sponsoring double
hearsay and that Inlow himself would only be repeating
what he was told by Ringswald.

Both defendants did manage to impeach Ringswald
while cross-examining Agent Bayless. Through Bayless the
jurors learned that over several years Ringswald had
received from the ATF tens of thousands of dollars for
his assistance. Cross-examination also revealed that
Ringswald was on probation for a state conviction and
facing revocation when he assisted the ATF in this case.

Logan did call Ringswald, prompting the government
to remind the district court about its pretrial order
limiting the defendants' ability to make him a witness
simply to impeach his out-of-court statements. The prose-
cutor demanded that the court force Logan's attorney
to state "his reason aside from impeachment for calling
Mr. Ringswald in this case." The court replied that its
written ruling had rested on precedents involving infor-
mants who played a less significant role than Ringswald.
Still, the court did not lift its restriction on cross-exam-
ining Ringswald, but instead permitted Logan to
inquire about his statement to Agent Bayless at
the forest preserve that he had possession of the
Sturm Ruger revolver. The court reiterated, however, that

Ringswald could not be called "merely to dirty him up, as might be the objective in another case on different facts and different circumstances."

## II.

Walker was convicted on all counts. Logan was convicted on the conspiracy and § 924(c)(1) counts but acquitted of attempting on May 1 to possess cocaine for distribution. Walker has not raised an appellate claim about the sufficiency of the evidence, but Logan does. He contends that the government failed to prove him guilty of the drug conspiracy or the charged violation of § 924(c)(1). We will uphold the verdicts if we conclude, after reviewing the trial evidence in the light most favorable to the government, that a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *United States v. Woods*, 556 F.3d 616, 621 (7th Cir. 2009).

To convict Logan of conspiracy under 21 U.S.C. § 846, the government was obligated to prove only that he and Walker agreed to acquire cocaine for distribution. *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2011); *United States v. Longstreet*, 567 F.3d 911, 919 (7th Cir. 2009). The defendants' recorded statements—standing alone—provide overwhelming evidence that they plotted an armed robbery with the aim of stealing a substantial quantity of cocaine. Logan's confession, moreover, makes his insufficiency claim particularly frivolous. Indeed, in *United States v. Corson*, 579 F.3d 804,

806-11 (7th Cir. 2009), we rejected a claim of insufficient evidence in a prosecution resting on strikingly similar evidence. There, the defendants also had been convicted of conspiring to carry out an armed robbery of a fictitious stash house to obtain cocaine for sale. In rejecting their sufficiency challenge, we recounted that the defendants had met an informant several times to discuss the proposed robbery and refine the details, expressed willingness to kill the stash-house guards if necessary, acknowledged the quantity of cocaine they expected to steal, settled on how to split the loot, given repeated assurances that they were "down" for the job, and arrived together at the staging area (where drug agents were waiting to make arrests). *Id*. at 811. These same factors are present here, and in addition it was Logan who wanted to broaden the plot to steal whatever cash might be available in the house even if the robbery would become riskier. *See also United States v. George*, 658 F.3d 706, 709 (7th Cir. 2011); *United States v. Lewis*, 641 F.3d 773, 782 (7th Cir. 2011).

Logan's challenge to his gun conviction is equally weak. His argument is premised on the mistaken belief that the government was required to prove that he personally possessed the Sturm Ruger revolver. Yet a § 924(c)(1) conviction may rest on a theory of coconspirator liability under *Pinkerton v. United States*, 328 U.S. 640 (1946), which the government can establish with proof that the defendant reasonably could have foreseen that a coconspirator would arm himself to further the conspiracy, *United States v. Haynes*, 582 F.3d 686, 707 (7th Cir. 2009); *United States v. McLee*, 436 F.3d 751, 758 (7th

Cir. 2006); *Woodruff v. United States*, 131 F.3d 1238, 1243 (7th Cir. 1997). Logan's jury was instructed on *Pinkerton*, and he does not dispute that a rational finder of fact could have concluded that Walker acquired the revolver during, and to further, the conspiracy. And plainly the existence and purpose of the Sturm Ruger revolver was known to Logan: He was present when Walker stopped at his girlfriend's house to retrieve this second gun, and it was Logan who suggested that the planned heist would be a "Mission Impossible-ass" assignment with only one firearm.

Our conclusion about the strength of the evidence makes easier the task of addressing the defendants' confrontation claim, which has legal merit but no practical significance. Walker and Logan jointly argue that their Sixth Amendment right to confrontation was violated when the district court allowed prosecutors to introduce hearsay statements made by Ringswald and then compounded the error by restricting their ability to impeach him. As a result, the defendants maintain, a new trial is warranted. The defendants do not argue for reversal on the ground that the introduction of the statements violated the rules of evidence, and therefore only the Confrontation Clause challenge is presented.[1]

---

[1] The concurrence maintains that we cannot decide the Confrontation Clause issue because the defendant could have also successfully presented a challenge based on Rule 802. The proviso that we decide statutory issues before constitutional ones applies to claims before the court, as was the situation in

(continued...)

---

[1] (...continued)

the case cited by the concurrence, *New York City Transit Authority v. Beazer*, 440 U.S. 568, 582 (1979); it has not been interpreted to mean that a litigant must present any possible claims, nor have we refused to consider a constitutional claim on the basis that the defendant could also have brought a successful statutory claim. We should not in fact encourage the kitchen-sink approach that would ensue. The concurrence would refuse to decide preserved constitutional claims where other non-constitutional issues not raised would have required reversal. That turns forfeiture doctrine on its head—from preventing a defendant from raising an unpreserved claim to preventing a defendant from raising a *preserved* claim because a separate meritorious claim was not pursued as well. It would require a court to engage in its own fishing expedition, scouring the record for possible evidentiary challenges that could have been raised, and then deciding without the benefit of argument from the parties whether those claims would have been successful. Where the answer is yes, the court would then be prevented from considering the constitutional claim. Where the errors are not harmless, it is difficult to see where this doctrine would leave us. Apparently, we would have to rule against the defendant on a meritorious claim because a second meritorious claim was not pursued, or sua sponte relieve the defendant of his forfeiture and decide the unargued claim. Neither option is sound. The Confrontation Clause is not subsumed by the rules of evidence, such that it may only be used to challenge those rules, as the concurrence would hold. It protects the right to confront witnesses. Under the Confrontation Clause, the defendants were not required to demand the exclusion of the evidence; they could demand

(continued...)

The government counters that both defendants forfeited this claim by failing to make a focused objection. We are skeptical of that contention, especially since Walker made explicit reference to *Crawford v. Washington* in his written opposition to the government's motion *in limine*. The district court's order granting that motion was applicable to *both* defendants, and the government's silence—in its brief and at oral argument—about Walker's reference to *Crawford* is illuminating. As we shall see, however, plenary review would still lead us to conclude that any confrontation error was harmless, and thus we can dispense with further discussion about the clarity of the defendants' objections. *See United States v. Sachsenmaier*, 491 F.3d 680, 683 (7th Cir. 2007); *United States v. Jones*, 248 F.3d 671, 675 n.1 (7th Cir. 2001).

The Confrontation Clause of the Sixth Amendment guarantees the right of the accused to confront the witnesses against him. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). As the Supreme Court has repeatedly recognized, "'the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" *Id.*; *Delaware v. Fensterer*, 474 U.S. 15, 19

---

[1] (...continued)
instead that the government produce the witness if introducing the evidence, which is what the defendants chose to do. The government declined to call Ringswald, and there is nothing that should present this court from considering the defendants' properly-preserved constitutional claim.

(1985); *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). The Court thus has held that under the Confrontation Clause, testimonial statements of a witness who did not appear at trial may be admitted only if the witness is unavailable and the defendant had a prior opportunity to cross-examine. *Crawford v. Washington*, 541 U.S. 36, 53-4, 59 (2004).

Moreover, it is not enough that the witness is available to be subpoenaed at trial by the defendant. The Supreme Court addressed that situation in *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009), in which the respondent asserted that there was no Confrontation Clause violation because the petitioner had the ability to subpoena the analysts whose lab reports were introduced as evidence. The Court held that the power to subpoena witnesses, whether through state law or the Compulsory Process Clause, "is no substitute for the right of confrontation." *Id.* at 2540. The Court then explained:

> Converting the prosecution's duty under the Confrontation Clause into the defendant's privilege under state law or the Compulsory Process Clause shifts the consequences of adverse-witness no-shows from the State to the accused. More fundamentally, the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court. Its value to the defendant is not replaced by a system in which the prosecution presents its evidence via ex parte affidavits and waits for the defendant to subpoena the affiants if he chooses.

*Id.;* see also 4 Clifford S. Fishman and Anne T. McKenna, Jones on Evidence § 25A:49 (Supp. 2011-12). Accordingly, a government seeking to admit testimonial statements of a witness must either produce that witness at trial or establish that the witness is unavailable and that the defendant had a prior opportunity for cross-examination.

Even if the witness is produced at trial, the Confrontation Clause may be violated if the court unduly restricts cross-examination. The Confrontation Clause guarantees an opportunity for a thorough and effective cross-examination, though not one that is unbounded. *Fensterer*, 474 U.S. at 20; *United States v. Sasson*, 62 F.3d 874, 882 (7th Cir. 1995). A trial court may impose reasonable limits on the scope of cross-examination, but the defendant's rights under the Confrontation Clause may be violated if those limitations completely foreclose a defendant from exploring the witness' bias or motive to testify. See *Van Arsdall*, 475 U.S. at 679; *Sasson*, 62 F.3d at 883.

As the defendants recognize, the vast majority of Ringswald's statements on the recordings constitute admissible nonhearsay because they were not offered for their truth. Ringswald was following an ATF script when he enlisted and plotted with the defendants to rob the phony stash house, so his parts of the recorded conversations were offered to make the defendant's statements intelligible. *See United States v. Gaytan*, 649 F.3d 573, 580 (7th Cir. 2011); *United States v. York*, 572 F.3d 415, 427 (7th Cir. 2009); *United States v. Nettles*, 476 F.3d 508, 517-18 (7th Cir. 2007); *United States v. Van Sach*, 458 F.3d 694, 701 (7th Cir. 2006). Yet Ringswald's statements

to Agent Inlow conveying that Walker gave him the Smith & Wesson revolver, as well as his recorded statement in the forest preserve alerting Agent Bayless about the newly acquired Sturm Ruger revolver, are textbook hearsay. These statements were offered for their truth, and we are disturbed by the government's assertion that they were introduced for the ostensibly nonhearsay purposes of providing "context" and showing the course of the government's investigation. And perhaps more troubling is the prosecutors' belief that Bayless could provide the foundation for the admission of Ringswald's hearsay statements to Agent Inlow, who did not even testify at Logan's trial.

The government's position displays a misunderstanding about the permissible use of an informant's out-of-court statements. We have explained that such statements are admissible as nonhearsay when offered to make a defendant's recorded statements intelligible for the jury (that is, for context), *Nettles*, 476 F.3d at 517-18, or when brief and essential to "bridge gaps in the trial testimony" that might significantly confuse or mislead jurors, *Jones v. Basinger*, 635 F.3d 1030, 1046 (7th Cir. 2011). But these limited nonhearsay uses do not "open the door for law enforcement officers to 'narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination.'" *Id*. at 1047 (quoting *United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004)). Indeed, the argument the government makes to us now is one that we have rejected already: "Under the prosecution's theory, every time a person says to the police 'X committed the crime,' the statement

(including all corroborating details) would be admissible to show why the police investigated X. That would eviscerate the constitutional right to confront and cross-examine one's accusers.*" Silva*, 380 F.3d at 1020.

The government repeatedly hides behind its asserted needs to provide "context" and relate the "course of investigation." These euphemistic descriptions cannot disguise a ploy to pin the two guns on Walker while avoiding the risk of putting Ringswald on the stand. The government was free to elicit through Agent Inlow that Ringswald had given him the Smith & Wesson. The government also was free to elicit through Agent Bayless that the informant had given him the Sturm Ruger. But if other admissible evidence could not satisfactorily link these guns back to the defendants, prosecutors were not free to ignore the rules of evidence in the interest of disassociating themselves from their informant. A prosecutor surely knows that hearsay results when he elicits from a government agent that "the informant said he got this gun from X" as proof that X supplied the gun. On this point we agree with the defendants that the government's use of Ringswald's out-of-court statements about the source of the guns cannot be understood any other way.

It follows that these particular statements constituted testimonial hearsay. And since Ringswald was available and the government did not call him to testify at Walker's trial, Walker's right to confrontation was violated. *Crawford*, 541 U.S. at 53-4; *Melendez-Diaz*, 129 S. Ct. at 2540; *Silva*, 380 F.3d at 1019-20. The same is arguably true

about Logan; although it might seem that the confronta-
tion issue was resolved when Logan himself called
Ringswald, the government has made little effort
to counter Logan's contention that his questioning of
the informant was cabined to the point that there was
no confrontation at all. *See Van Arsdall*, 475 U.S. at 679;
*Stock v. Rednour*, 621 F.3d 644, 649 (7th Cir. 2010), *cert.
denied*, 131 S. Ct. 1022 (2011); *United States v. Martin*, 618
F.3d 705, 727-28 (7th Cir. 2010). Nonetheless, we review
violations of the Confrontation Clause for harmless
error. *United States v. Adams*, 628 F.3d 407, 416 (7th Cir.
2010), *cert. denied*, 132 S. Ct. 201 (2011). " 'Whether an
error is harmless beyond a reasonable doubt depends
upon factors such as the importance of the witness's
testimony in the prosecution's case, whether the testi-
mony was cumulative, the presence or absence of corrobo-
rating or contradictory evidence and the overall strength
of the prosecution's case.' " *Martin*, 618 F.3d at
730 (quoting *United States v. Smith*, 454 F.3d 707, 715
(7th Cir. 2006)).

   In this case we are confident that whatever constitu-
tional violation resulted from the government's introduc-
tion of testimonial hearsay was harmless beyond a rea-
sonable doubt. The hearsay linking the two guns to the
defendants was inconsequential in light of their own
recorded statements. Our conclusion that overwhelming
evidence was presented against Logan applies equally
to Walker, and that assessment would not be different
even if the district court had excluded the hearsay
elicited through Agents Bayless and Inlow. Walker
bragged to Bayless—on tape—that he had given Ringswald
the Smith & Wesson revolver. And with evidence that

includes the nonstop recording of the defendants' trip with Ringswald to the forest preserve, there is not a hint of doubt that the Sturm Ruger revolver carried by Ringswald at the end of that journey had been picked up along the way. Thus the government's strategy, although not to be condoned, did not harm the defendants.

That brings us to a final argument, again raised by Logan alone. He contends that his overall prison sentence is unreasonably long because the district court did not reduce it to compensate for what Logan characterizes as "sentencing entrapment." Logan explains that in the past his drug dealing had involved very small quantities, "in stark contrast to the 80 to 100 kilograms of cocaine" Agent Bayless had bandied in front of him "to induce him to participate in the stash house robbery." The ATF inflated the "payday," he says, to ensure a 20-year minimum term for the drug conspiracy.

We reject this contention. "Sentencing entrapment" may arise when investigators work unrelentingly to persuade a target who is predisposed to commit a particular crime to instead commit a greater offense. *United States v. Villegas*, 655 F.3d 662, 676 (7th Cir. 2011); *United States v. White*, 519 F.3d 342, 347 (7th Cir. 2008). That's not what Logan is saying. His argument, which concerns only the § 846 conviction, presumes that he was predisposed to participate in a drug conspiracy, although not one involving such a large quantity of cocaine. One problem with this reasoning is that quantity is not an element of a conspiracy to possess drugs for distribution, *Edwards v. United States*, 523 U.S. 511, 513-14 (1998); *United States*

*v. Garcia*, 580 F.3d 528, 535 (7th Cir. 2009); *United States v. Martinez*, 518 F.3d 505, 509 (7th Cir. 2008), so there is no legal footing for Logan's claim that he wanted only to commit a "lesser" crime but was pushed to participate in one that was more serious. More importantly, however, Logan cites nothing in the record suggesting that Agent Bayless or Ringswald pressed him, even slightly, to become involved. What Logan says is that Bayless "offered" him the chance to participate in a robbery of 80 to 100 kilograms,[2] but what he does not say is that he jumped at the opportunity. In fact, it was Logan who later proposed that the foursome rush into the stash house—guns blazing—and grab, not just the cocaine, but whatever cash might be in the hands of the guards. As is evident, the government did not expend any energy coaxing Logan's involvement.

### III.

The judgment entered against each defendant is AFFIRMED.

---

[2] Logan was sentenced to a total of 25 years' imprisonment: 20 years for the drug conspiracy plus 5 for the § 924(c)(1) offense. Five years was the minimum penalty on the gun count, which by statute was required to run consecutively to the conspiracy sentence. 18 U.S.C. § 924(c)(1)(A)(i). And since Logan already had a felony drug conviction, any amount of cocaine equaling 5 or more kilograms would have mandated the 20-year term he received. 21 U.S.C. § 841(b)(1)(A)(ii).

EASTERBROOK, *Chief Judge*, concurring. I agree with the majority that the judgment must be affirmed, but I do not think it necessary or appropriate to discuss the confrontation clause of the sixth amendment. The evidence to which Walker and Logan objected is hearsay: out-of-court statements offered to establish the truth of the asserted propositions. It should have been excluded under Fed. R. Evid. 802, though the district court's error was harmless. Yet in this court defendants do not stand on their rights under the Rules of Evidence. They present only a constitutional argument.

" 'If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.' *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944). Before deciding the constitutional question, it was incumbent on [the district and appellate] courts to consider whether the statutory grounds might be dispositive." *New York City Transit Authority v. Beazer*, 440 U.S. 568, 582 (1979). A statutory ground of decision, Rule 802, is available here, and it is dispositive—against defendants, because it has been forfeited. Litigants cannot foist constitutional adjudication on a court by forfeiting a winning statutory argument. If my colleagues think that enforcing the forfeiture doctrine would be unjust under the circumstances, then they should relieve defendants of their forfeiture (which this court can do; defendants did not waive the hearsay objection) rather than use the forfeiture as the fulcrum for deciding a constitutional issue unnecessarily.

Rule 802 is significant for a second reason. It means that there cannot be a substantive problem under the confrontation clause. The Constitution says that every defendant has a right to be confronted by the witnesses against him, but not that he has a right to ignore the rules that implement this entitlement. In federal court, Rule 802 is the principal means by which confrontation is achieved. The sixth amendment does not authorize defendants to disregard the rules established for their protection and then insist that their rights have been violated.

There is a genuine constitutional issue only if the rules allow particular evidence to be admitted, and a litigant contends that these rules violate the Constitution. See, e.g., *Rehman v. Gonzales*, 441 F.3d 506, 508 (7th Cir. 2006); see also *Portillo-Rendon v. Holder*, 662 F.3d 815, 817 (7th Cir. 2011) (collecting authority). In cases such as *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), a state court received evidence that was admissible under the state's rules, and the aggrieved litigant maintained that the *rule* violated the confrontation clause. Walker and Logan do not make such an argument; they do not contend that any of the Federal Rules of Evidence is deficient. Nor could they; the Rules offer more protection than the Constitution does.

Ringswald, the declarant, testified in Logan's trial (though not Walker's). "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. See *California v. Green*, 399 U. S. 149, 162

(1970)." *Crawford v. Washington*, 541 U.S. 36, 60 n.9 (2004). So Logan does not have a serious claim under the sixth amendment—but he *does* have a good argument under Rule 802, which, unlike the confrontation clause, does not drop out of the picture just because the declarant testifies. None of the exceptions in Rules 803 or 807, which apply whether or not the declarant is available as a witness, covers the hearsay introduced at Logan's trial, and none of the subsections to Rule 801 puts the statements in question outside the scope of the hearsay rule.

Because defendants have not contended in this court that the admission of the evidence violates Rule 802, and do not argue that the Federal Rules of Evidence violate the confrontation clause, we should affirm the judgment without ado.