**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit
Chicago, Illinois 60604**

Submitted September 26, 2013[*]
Decided September 26, 2013

**Before**

WILLIAM J. BAUER, *Circuit Judge*

RICHARD D. CUDAHY, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 13-1442

| | |
|---|---|
| COREY THOMAS, | Appeal from the United States District |
| *Movant-Appellant*, | Court for the Western District of Wisconsin. |
| *v.* | |
| | No. 12-cv-269-bbc |
| UNITED STATES OF AMERICA, | |
| *Respondent-Appellee*. | Barbara B. Crabb, *Judge*. |

**O R D E R**

Corey Thomas was convicted after a jury trial for his role in two bank robberies committed during a brief period. After we upheld his convictions and 348-month sentence on direct appeal, *United States v. Beck*, 625 F.3d 410 (7th Cir. 2010), Thomas

---

[*] After examining the briefs and the record, we have concluded that oral argument is unnecessary. The appeal is thus submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

filed a collateral challenge claiming that his trial lawyer was ineffective, *see* 28 U.S.C. § 2255. The district court rejected that claim but issued a certificate of appealability allowing Thomas to pursue the claim on appeal. His allegations about trial counsel's performance are, for the most part, frivolous.

As recounted in our prior opinion, Thomas entered a Bank Mutual branch in Madison, Wisconsin, with Prince Beck and Jarrell Murray and stole $5,000. Thomas's fingerprints were found on the robbers' abandoned getaway car. While authorities investigated that robbery, the three men plotted with Michael Simmons and Lamar Liggons to rob another bank. Simmons agreed that his van would serve as the getaway vehicle and lent Beck a handgun. The five men traveled in the van to a branch of U.S. Bank, also in Madison. En route Thomas bought gloves at a convenience store. Everyone except Simmons donned masks and the gloves. Simmons, who is paralyzed and confined to a wheelchair, entered the bank first and feigned interest in opening an account. The others then rushed inside and demanded money from bank employees (Liggons now had Simmons's handgun). A surveillance video introduced at trial recorded images of Thomas's mask slipping, revealing his forehead.

The robbers got away with more than $130,000, but success was fleeting. Simmons was deserted by his comrades and quickly arrested. Police found his abandoned van and recovered the packaging from the gloves with Thomas's fingerprints.

The other men split up. The day after the robbery, Thomas went with a used-car dealer to an auto auction in Fond du Lac, Wisconsin, and handed over more than $6,000 in mostly $100 bills to buy a used Lincoln. (During the previous two months, Thomas had been unemployed except for two weeks when he worked at a factory.) He was driving the Lincoln back to Madison when police descended. The car dealer was in his own car. The officers had learned the number to Thomas's cell phone and tracked the phone to Fond du Lac. Thomas was carrying the phone and about $13,000 in currency. The dealer had ownership documents for the Lincoln in his car.

Meanwhile, Simmons needed money for bail and several times used a jail telephone to converse with Beck. The calls were recorded and played for the jury. Simmons and Beck discussed the robbery in transparent code. For example, they talked about what to do with the "bread" and the possibility that the obstruction-of-justice charge for which Simmons had been arrested could be "upgraded." But the two did not mention Thomas beyond Beck saying that he had been arrested and taken to jail. No one came forward with bail money.

Thomas was charged with conspiring to rob, and with robbing, both banks. *See* 18 U.S.C. §§ 371, 2113. He also was charged with brandishing a firearm during a crime of violence. *See id.* § 924(c)(1)(A)(ii). His lawyer moved to suppress on Fourth Amendment grounds not only the cell phone and currency found on Thomas but also the documents recovered from the auto dealer's car. Counsel additionally argued that what the police had learned from interviewing the dealer should be excluded as poisoned fruit. After filing the motion, however, counsel discussed only the phone and currency and convinced the district court to suppress those items.

Murray, Simmons, and Liggons pleaded guilty; the latter two testified for the government at the trial of Thomas and Beck. Both testifying codefendants identified Thomas as a fellow robber. On cross-examination Thomas's lawyer impeached Simmons with, among other statements, his inconsistent accounts about when he gave the handgun to Beck for use in the second robbery.

During closing argument the prosecutor highlighted the testimony from Simmons and Liggons as well as the video of Thomas's mask slipping. Drawing the jury's attention to a frame depicting the robber's forehead and comparing it to a photograph of Thomas's head, the prosecutor asserted: "That's the distinctive brow I'm talking about. It's entirely consistent with the identification by Mr. Liggons and Mr. Simmons." The jury acquitted Thomas of the first bank robbery but found him guilty on the remaining counts.

Thomas's postconviction claim about trial counsel rests on the premise that counsel should have objected to the prosecutor's comment about his distinctive brow and also should have challenged the admission of the ownership documents for the Lincoln and the car dealer's testimony, the recordings of Beck and Simmons talking on the phone, and the allegedly coerced testimony from Simmons about when he gave his gun to Beck. None of these omissions is significant.

We start with the evidence that Thomas says should have been challenged by trial counsel. First, concerning the documents found in the auto dealer's car, that vehicle did not belong to Thomas, and neither was he driving or riding in it. Without a reasonable expectation of privacy in the car, Thomas could not challenge its search or the fruits of that search. *See Rawlings v. Kentucky*, 448 U.S. 98, 105–06 (1980); *United States v. Carlisle*, 614 F.3d 750, 758–59 (7th Cir. 2010); *United States v. Duprey*, 895 F.2d 303, 309–10 (7th Cir. 1989). And counsel could not have been deficient in refraining to

pursue a doomed argument. *See Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986); *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010).

Second, Thomas assumes that introducing the recorded phone conversations between Beck and Simmons violated the Confrontation Clause as interpreted in *Bruton v. United States*, 391 U.S. 123 (1968). That decision holds that introducing a nontestifying codefendant's out-of-court confession violates the Confrontation Clause if the confession directly incriminates the defendant on trial. *Id.* at 127–28. Although their thinly veiled references to the second bank robbery incriminated the speakers, Beck's statements during the phone conversations did not amount to a *confession* elicited by police during a custodial interrogation. For that reason, *Bruton* is irrelevant, a point overlooked by the government and the district court. *See Dutton v. Evans*, 400 U.S. 74, 87 (1970) (distinguishing *Bruton* from situation where nontestifying defendant's statements were made in context other than inherently coercive setting of custodial interrogation by police); *United States v. York*, 933 F.2d 1343, 1362–63 (7th Cir. 1991) (same); *United States v. Dale*, 614 F.3d 942, 956 (8th Cir. 2010) (same); *Hill v. Hofbauer*, 337 F.3d 706, 715–17 (6th Cir. 2003) (same). Further, Beck's statement relaying that Thomas had been arrested was not hearsay because it was not offered to prove the fact of Thomas's arrest. *See* FED. R. EVID. 801(c); *United States v. York*, 572 F.3d 415, 427 (7th Cir. 2009); *United States v. Thomas*, 453 F.3d 838, 845 (7th Cir. 2006). The government had no reason to put on evidence that Thomas had been arrested; he obviously had—he was on trial. Thus, we cannot fault Thomas's lawyer for not objecting.

Third, Thomas maintains that the government, unchallenged by his lawyer, coerced Simmons to testify falsely about giving Beck the gun used in the second robbery. According to Thomas, Simmons's story about *when* the gun was given to Beck shifted between his statements to investigators, his grand-jury testimony, and his trial testimony. Thomas speculates that the government pressured Simmons to go with the version elicited at trial, but does not explain how his lawyer would or should have known about this alleged coercion. Counsel cannot be deficient in not objecting to an impropriety he had no way of discovering. *See Gardner v. United States*, 680 F.3d 1006, 1010 (7th Cir. 2012); *Koons v. United States*, 639 F.3d 348, 354 (7th Cir. 2011). More importantly, the timing of the handoff of the gun from Simmons to Beck is a collateral issue that does not directly relate to Thomas's guilt or innocence, and so any inconsistencies are of no moment. *See Simental v. Matrisciano*, 363 F.3d 607, 615 (7th Cir. 2004); *Tayborn v. Scott*, 251 F.3d 1125, 1131 (7th Cir. 2001). If Thomas's goal is to undermine his § 924(c) conviction—which rests on Liggon's brandishing the gun during the robbery—he achieves nothing by trying to distance himself from the gun. The jury

was instructed on coconspirator liability, *see Pinkerton v. United States*, 328 U.S. 640, 646–47 (1948), so Thomas is on the hook for Liggon's possession of the gun, no matter its source. *See United States v. Walker*, 673 F.3d 649, 655 (7th Cir. 2012); *United States v. Simmons*, 581 F.3d 582, 587–88 (7th Cir. 2009).

What is left is Thomas's assertion that his attorney should have objected to the prosecutor's comment during closing argument that the robber whose mask slipped in the video had the same "distinctive" brow as Thomas. But the prosecutor did nothing more than invite the jury to compare the video with a photograph of Thomas. The characterization of the brow as "distinctive" and the inference that Thomas is the robber depicted in the video both rest on evidence that the jurors had seen and could evaluate for themselves. *See United States v. Morris*, 498 F.3d 634, 643 (7th Cir. 2007); *United States v. Carrera*, 259 F.3d 818, 829 (7th Cir. 2001); *United States v. Cole*, 41 F.3d 303, 310 (7th Cir. 1994) (rejecting contention that prosecutor acted improperly in characterizing defendant's handwriting as "distinctive" and suggesting that it matched handwriting on documents in evidence).

Thomas also says that his attorney should have challenged the prosecutor's statement that the video is consistent with Simmons's and Liggons's identification of Thomas. In Thomas's view the prosecutor inappropriately vouched for Liggons and Simmons. But the prosecutor did not offer his own, unsupported personal opinion that Liggons and Simmons had told the truth; his statement was grounded in the evidence presented. *See United States v. Nunez*, 532 F.3d 645, 654 (7th Cir. 2008); *United States v. Johnson*, 437 F.3d 665, 673–74 (7th Cir. 2006).

At all events, even if trial counsel made mistakes, any misstep could not have prejudiced Thomas. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). As we noted in Thomas's direct appeal, the government had a strong case, which included (as the prosecutor reminded the jury in closing argument) Thomas's finger prints on the getaway vehicle from the first robbery and the packaging from the gloves in the second. And his purchase of the Lincoln with $100 bills a day after the second bank robbery could not have been lost on the jury. *Beck*, 625 F.3d at 415, 421.

AFFIRMED.